Opinión disidente emitida por la
Jueza Asociada Señora Fiol Matta,
a la cual se unen el Juez Presidente Señor Hernández Denton y la Juez Asociada Señora Rodríguez Rodríguez.
Vía Verde es el nombre de un gasoducto propuesto para proveer energía eléctrica a Puerto Rico durante los próxi-mos 50 años. Ese gasoducto transportaría gas natural, un combustible fósil no renovable, en un trayecto de 92 millas, desde la terminal de gas natural de Eco Eléctrica, en Pe-ñuelas, hasta las centrales de la Autoridad de Energía Eléctrica (A.E.E.) de Cambalache, en Arecibo; de Palo Seco, en Toa Baja, y de San Juan, atravesando 1,191.3 acres de terreno en 13 municipios: Peñuelas, Adjuntas, Utuado, Arecibo, Barceloneta, Manatí, Vega Baja, Vega Alta, Do-rado, Toa Baja, Cataño, Bayamón y Guaynabo.
La Declaración de Impacto Ambiental Final (DIA-F) de Vía Verde señala que, durante la planificación para el ga-soducto, “se trató, en lo posible, de mantener distancias prudentes de las comunidades, evadir áreas de valor ecoló-gico y de evitar impactos significativos a la agricultura”, pero, por la magnitud del proyecto, hay impactos que no se pueden minimizar(1) Asimismo, indica que “[d]e acuerdo al *928 análisis de los aspectos que se discuten en esta DIA, con-cluimos que la construcción de Vía Verde tiene un impacto ambiental significativo, debido a la extensión territorial que abarca y la diversidad de áreas que atraviesa”.(2) Los vecinos del proyecto arguyen que lo descrito, así como lo obviado, en la DIA-F de Vía Verde, como documento que da paso al gasoducto, representa una amenaza directa a su tranquilidad, su salud, su permanencia en sus residencias, el disfrute de sus propiedades y de la naturaleza que las rodea, la utilidad de sus terrenos, su sustento económico, las condiciones ambientales, la seguridad, la calidad de vida y la vida misma de las personas que residen en esas áreas. Por ello, esos ciudadanos y ciudadanas impugnaron la aprobación de la DIA-F por la Junta de Calidad Ambien-tal (J.C.A.) en el Tribunal de Apelaciones.
Una mayoría de este Tribunal resuelve hoy que esos ve-cinos no tienen legitimación activa para presentar tal impugnación. Decide que lo establecido en Fund. Surfrider y otros v. A.R.Pe.(3) aplica a la revisión judicial de procedi-mientos administrativos acelerados como el utilizado en Vía Verde, que son tramitados al amparo de las disposicio-nes de la Ley Núm. 76-2000, la cual permite obviar los requisitos de permisos, endosos, consultas y certificaciones cuando se declare alguna “emergencia” mediante orden ejecutiva.(4) Además, hace un examen inconcebiblemente restrictivo de los daños alegados por los vecinos en su es-crito de revisión administrativa, que fueron apoyados con evidencia, para concluir que éstos son especulativos.
Entiendo que el análisis en el que se basa la opinión mayoritaria, el mismo empleado en Surfrider es erróneo. Más aun, aunque se utilice el escrutinio riguroso de Sur-frider, los recurridos demostraron que tienen legitimación *929 para impugnar judicialmente la acción gubernamental que claramente les perjudica. Por eso, disiento enérgicamente de la determinación mayoritaria, que parece indicar que cuando una persona alega algún daño ambiental tiene que esperar a que suceda una catástrofe para poder ser escu-chada en nuestros tribunales.
I
Contrario a lo que enuncia la opinión mayoritaria, los ciudadanos que impugnan la DIA-F del proyecto de ga-soducto Vía Verde lograron establecer que están sufriendo o sufrirán un daño claro, palpable, concreto, real, no hipo-tético ni abstracto, no especulativo, específico, preciso y particular, y que es causado por la acción administrativa que objetan. Así, cumplieron con los requerimientos de gran especificidad que exige la nueva normativa de legiti-mación adoptada en Fund. Surfirider y otros v. A.R.Pe., supra, para acudir a los tribunales. Pero, a pesar de que se ajustaron a lo dispuesto en ese precedente, la mayoría les exige más.
El Tribunal de Apelaciones determinó correctamente que los recurridos justificaron tener legitimación activa, pues demostraron
... con datos suficientes, el grado de afección necesario para solicitar la revisión judicial ante este foro apelativo. En dicho recurso establecen, como daños palpables, claros y no especu-lativos que las áreas por donde pasará la ruta propuesta para el Gasoducto impactan directamente las inmediaciones de sus residencias y terrenos, lo que les ocasiona una situación emo-cional y de angustia colectiva. Es importante establecer que gran parte de las afectaciones que justifican la legitimación activa de los recurrentes nacen del interés que estos tienen sobre sus propiedades y actividades de vida y comercio. A diferencia del caso de Surf rider, de las alegaciones del Sr. Juan Cortés Lugo y otros sí se puede establecer una considerable proximidad entre las residencias de los recurrentes y el pro- *930 yecto del gasoducto.(5)
Sin embargo, la Opinión mayoritaria revoca esta deter-minación, indicando que todos los daños claros y los datos suficientes que examinó el Tribunal de Apelaciones son meras especulaciones. Las declaraciones sobre los daños y la extensa documentación que presentaron los recurridos en su recurso de revisión administrativa —que incluye ar-gumentos jurídicos, estudios científicos, informes oficiales e información histórica— y sobre las que edifican sus re-clamaciones se resumen escuetamente en la Opinión ma-yoritaria para luego concluir, sin mayor análisis, que esas alegaciones no detallan de forma específica en qué consis-ten los daños particulares.(6)
Los daños que sirven para conferir legitimación activa, como se ha descrito y repetido en innumerables ocasiones en las decisiones de este Tribunal y señala también la opi-nión mayoritaria,(7) pueden basarse en consideraciones económicas, espirituales, ambientales, recreativas o estéticas.(8) Asimismo, y acorde con la norma pautada en Surfrider basta con que uno de los peticionarios posea legi-timación activa para que proceda la revisión judicial.(9) Con ello en mente, veamos las *931 alegaciones de los recurridos en su escrito de revisión y estudiémoslos de manera integrada con las disposiciones de nuestro ordenamiento jurídico, incluyendo la opinión del caso de Surfrider.
A. Daños ambientales
Hemos establecido que incumplir con una declaración de impacto ambiental es, de por sí, considerado un daño irreparable, pues los daños al ambiente son de carácter permanente.(10) Preparar una declaración de impacto am-biental completa y cuidadosa, como exigen los ciudadanos en este caso, es esencial para evitar o mitigar esos daños permanentes e irreparables, porque una DIA debidamente aprobada por la J.C.A. es el requisito indispensable para que comience la construcción y la operación posterior del proyecto.(11)
Las declaraciones de impacto ambiental sirven “para asegurar que la conservación y el uso racional de los recur-sos naturales [se tengan] en cuenta al momento de hacer planes y de tomar las primeras decisiones gubernamentales sobre una propuesta que pueda tener un impacto en el me-dio ambiente”.(12) El resultado que se espera de una DIA es que demuestre que el camino contemplado es “el de menor impacto ambiental”, luego de haberse estudiado las medi-das que podrían mitigar los efectos nocivos del proyecto y las alternativas a la acción propuesta, incluyendo la de no llevar a cabo proyecto alguno.(13) Para ello, se requiere que la agencia proponente realice un esfuerzo serio y escrupu-loso por discutir todas las consecuencias ambientales pre-visibles y que la J.C.A., como agencia creada para hacer *932 cumplir la Ley sobre Política Pública Ambiental y el man-dato constitucional de protección de los recursos naturales, estudie cabalmente las acciones que impactarían el medio-ambiente, a través de un procedimiento de consultas.(14) Las declaraciones de impacto ambiental así elaboradas cumplen con dos fines: que el proponente evalúe a fondo las consecuencias ambientales del proyecto que planifica y que se informe al público sobre éstas para que los ciuda-danos puedan tomar las acciones que estimen perti-nentes.(15)
En este punto, debemos advertir que los vecinos recurri-dos en este caso nunca pudieron presentar sus comentarios sobre la DIA-P ni mucho menos sobre la DIA-F, pues en las vistas públicas que se celebraron solo se discutió un borra-dor de documento ambiental que no incluía todos los aspec-tos que se hallan en la DIA.(16) Esas audiencias no cumplie-ron con su propósito, ya que no dieron espacio para reflexionar sobre todos los puntos de la propuesta y emitir sugerencias. Tampoco el Panel Examinador encargado de comunicar a la Junta de Gobierno de la J.C.A. lo expresado en las vistas públicas investigativas consideró todos los planteamientos presentados por los ciudadanos en esas vistas, pues el informe del Panel hace constar que no los discute debido a la gran cantidad de escritos que recibieron.(17) No se debe olvidar que el derecho a ser escu- *933 chado tiene un objetivo: que se tome en cuenta la idea expresada. Además, las vistas públicas sobre la DIA-P que solicitaron los ciudadanos fueron denegadas en la misma resolución de la J.C.A. en que se aprobó la DIA-F.(18) De acuerdo con los vecinos, la DIA-F tampoco atiende sus co-mentarios ni los de los expertos que depusieron.(19)
Tal como explica la resolución de la J.C.A. que aprueba la DIA-F de Vía Verde, “al requerirse la preparación de una DIA, ello presupone que existe la probabilidad de que la acción propuesta puede ocasionar un impacto significa-tivo sobre el ambiente; de lo contrario, no sería requerida la preparación [de] dicho documento ambiental”.(20) Del mismo modo, en Hernández, Álvarez v. Centro Unido ase-veramos que “el trámite de preparar urna declaración de impacto ambiental está reservado para aquellas ocasiones en que, por la gran magnitud del impacto ambiental de la acción propuesta (impacto significativo o sustancial), no sólo se requiere un análisis más riguroso de la acción, sino también que se examinen alternativas a ésta”.(21) El Regla-mento de Documentos Ambientales de la J.C.A. exige espe-cíficamente que se prepare una DIA, entre otras situacio-nes, cuando: (1) una acción pueda degradar significativa- *934 mente los usos del ambiente; (2) las acciones realizadas en diversas etapas del proyecto puedan tener un impacto acu-mulado significativo; (3) se pueda impactar significativa-mente un área donde existen recursos naturales o valores de importancia ecológica, recreativa, social, cultural o ar-queológica; (4) se afecten las áreas de amortiguamiento de los terrenos de la Zona Cárstica del Río Tanamá, y (5) se realicen extracciones, remociones, dragados o excavaciones en la corteza terrestre de la zona costanera o de las cuen-cas hidrográficas de ríos que se utilizan como toma de agua.(22) Un impacto ambiental significativo se define como el “efecto sustancial de una acción propuesta sobre uno o varios elementos del ambiente, tales como, pero sin limi-tarse a: una población biótica, un recurso natural, el am-biente estético o cultural, la calidad de vida, la salud pú-blica, los recursos renovables o no renovables; o que pueda sacrificar los usos beneficiosos del ambiente a largo plazo en favor de los usos a corto plazo o viceversa”.(23)
Evidentemente, al requerir la presentación de una DIA en este caso, las agencias gubernamentales reconocieron los altos riesgos ambientales y contra la salud pública y la calidad de vida que supone el proyecto de gasoducto Vía Verde. Sin embargo, cuando los vecinos señalan que sien-ten gran preocupación por su seguridad y por los efectos perniciosos que tendrá esta tubería de gas natural sobre *935 sus fincas, sus cosechas, los cuerpos de agua que pasan por sus propiedades y el medioambiente cercano a sus vivien-das, la Opinión mayoritaria concluye que esos vecinos es-tán especulando sobre los efectos adversos. Aun cuando, de entrada, existe una probabilidad de impacto significativo sobre el ambiente que rodea a estas personas, una mayoría de este Tribunal lo descarta porque cree que eso no es un daño suficientemente concreto. Los daños en el plano am-biental que exponen los vecinos son múltiples y no se ba-san solo en “creencias suyas”; surgen de la información ob-tenida por los vecinos a través de estudios científicos y técnicos sobre la propuesta de Vía Verde. Veamos algunos en detalle.
Los señores Carlos Cabán Cañedo, Luis Rodríguez Cruz y Jorge Rivera Rodríguez residen en el barrio Portugués, en Adjuntas. Además, son miembros y portavoces del Co-mité Barrio Portugués en Contra del Gasoducto, una orga-nización comunitaria que reúne a los vecinos de este sector y que tiene como fin la protección y el disfrute de los recur-sos naturales, así como de las propiedades que poseen sus miembros en el barrio Portugués. Esta asociación se dedica a realizar actividades educativas y de denuncia sobre el proyecto del Gasoducto, por lo que la aprobación de la DIA-F de Vía Verde afecta directamente los objetivos del grupo y de sus integrantes. (24) En el recurso de revisión administrativa que presentaron ante el Tribunal de Apela-ciones, los señores Cabán Cañedo, Rodríguez Cruz y Rivera Rodríguez, como individuos y como portavoces del Co-mité Barrio Portugués, señalaron que la DIA-F es insuficiente y no analiza de manera adecuada el impacto que tendrá el proyecto sobre sus propiedades y las zonas aledañas. El Comité, por conducto del señor Cabán Ca- *936 ñedo, depuso en las vistas públicas sobre la propuesta del gasoducto Vía Verde.(25)
Los portavoces del Comité Barrio Portugués indican que, tanto dentro de las propiedades de los miembros de la organización como en las áreas colindantes a éstas, hay varios cuerpos de agua importantes, de entre los cuales resaltan los que están localizados en las 42 cuerdas prote-gidas por el Fideicomiso de Conservación de Puerto Rico bajo la Servidumbre Escénica y de Conservación Clark Foreman, en donde nace el Río Portugués.(26) De acuerdo con lo que exponen en el escrito de revisión presentado ante el foro apelativo, la ruta propuesta para Vía Verde que recoge la DIA-F impactaría las quebradas, manantiales y pozos acuíferos de los cuales se sirven los integrantes de la co-munidad, algunos mediante sistemas de agua colectivos y otros individualmente. Esos cuerpos de agua son los que suplen principalmente al Río Portugués, en el cual se pro-pone construir una represa, y de manera secundaria al Río Grande de Arecibo y al Lago Dos Bocas.(27)
Estos ciudadanos están reclamando no sólo la protec-ción del ambiente en general del área en la que habitan, sino, muy específicamente, la protección del agua de la que *937 se sirven para sus necesidades diarias y de los cuerpos de agua que se encuentran en sus propiedades. En Paoli Méndez v. Rodríguez explicamos que el agua es un recurso indispensable para la actividad humana y que nuestro orde-namiento legal exige el mayor cuidado con el fin de asegurar su pureza y disponibilidad.(28) Asimismo, en Misión Ind. P.R. v. J.P. y A.A.A. destacamos la importancia de los sistemas para proveer agua a las residencias en Puerto Rico.(29) Todo ello es cónsono con la política pública del País de “mantener el grado de pureza de las aguas de Puerto Rico que requiera el bienestar, la seguridad y el desarrollo del país; asegurar el abasto de aguas que precisen las ge-neraciones puertorriqueñas presentes y futuras” y satisfa-cer con prelación las necesidades de agua para consumo doméstico.(30)
Los esposos Juan Cortés Lugo y Sofía Colón Matos, re-sidentes en el barrio Arenas de Utuado hace más de 30 años, viven en una finca de 22 cuerdas por la cual discu-rren riachuelos y manantiales. Lo mismo sucede con los esposos Luis Guzmán Meléndez y Ana Oquendo Andújar, quienes viven en su finca de 34 cuerdas en el Barrio Río Abajo de Utuado y cuyos tres hijos también tienen sus ca-sas en esa finca. Ambas familias se dedican a la agricul-tura y la calidad del agua que transcurre por sus terrenos,
*938 la cual se afectaría con la construcción de Vía Verde, es esencial para sus cultivos.(31)
El Sr. Gustavo Casalduc Torres es otro residente del Barrio Río Abajo de Utuado que será afectado por la ubicación cercana del Gasoducto. En su finca de tres cuerdas hay un manantial con una tubería para suplirle agua a él, a su familia y a otros vecinos del sector Graulau que toman su agua de allí. El paso del Gasoducto interrumpiría el sis-tema de agua rural de estas personas.(32) El señor Casal-duc Torres depuso en las vistas públicas sobre el proyecto, en nombre propio y del Comité Utuadeños Contra el Gasoducto.(33) Igualmente, Ana Serrano Maldonado y Félix Rivera González, residentes en el Barrio Arenas en Utuado, advirtieron que el Gasoducto impactaría directa-mente la fuente de agua de su comunidad y afectaría sus propiedades.(34)
La DIA-F de Vía Verde indica que el movimiento del terreno para la construcción del proyecto puede degradar la calidad del agua, al provocar turbidez, arrastrar conta-minantes y matar organismos acuáticos al disminuir el oxígeno disuelto que utilizan para respirar. Asimismo, se-ñala que el tráfico de maquinaria pesada y el movimiento de terreno pueden reducir la capacidad de absorción del suelo y causar impactos adversos a la agricultura. Sobre estos impactos, sólo se indica que se prepararán planes para minimizarlos.(35)
*939 Por su parte, Miguel Báez Soto, quien reside en el Barrio Caguanas en Utuado y transita a diario por un tramo de la ruta propuesta para el Gasoducto, es el portavoz del Comité Utuadeño en Contra del Gasoducto. Esta organiza-ción se dedica a realizar actividades educativas y de de-nuncia sobre el proyecto Vía Verde con el fin de proteger los recursos naturales de Utuado y garantizar el disfrute de éstos. Indicó el señor Báez Soto que los objetivos de su organización y los de sus miembros se ven adversamente afectados por la construcción y la operación eventual del Gasoducto, que inicia con la aprobación de la DIA-F de Vía Verde. (36) El señor Báez Soto, además, fue deponente en las vistas públicas sobre el gasoducto propuesto.(37)
En el escrito de revisión, además de estos daños muy específicos, los vecinos reclaman que la aprobación de una DIA-F insuficiente para el proyecto Vía Verde dará paso a efectos sustanciales adversos a los recursos naturales de las zonas en las que residen. Los daños ambientales seña-lados incluyen: impacto negativo sobre 369 acres de hume-dales que sirven de hábitat para la vida silvestre y favore-cen la recarga de los acuíferos;(38) actividades perjudiciales sobre áreas de importante valor ecológico en la Zona del Carso no contempladas en la DIA;(39) estudio deficiente so-bre el impacto que tendrá el proyecto en al menos 32 espe-cies vulnerables o en peligro de extinción de flora y fauna, según señalamientos del Servicio de Pesca y Vida Silvestre *940 federal(40) y perjuicio directo sobre yacimientos de alto valor arqueológico, incluyendo abrigos rocosos con petroglifos y restos de estructuras históricas, según identificados por los Programas de Patrimonio Histórico y de Arqueología y Etnohistoria del Instituto de Cultura Puertorriqueña y por la Oficina Estatal de Conservación Histórica.(41) Puntuali-zamos que, según el principio internacional de prevención que adoptó nuestra Ley sobre Política Pública Ambiental, no se requiere demostrar la posibilidad de estos daños con certeza científica. (42) Al amparo de ese principio, que, recal-camos, es parte de nuestro ordenamiento, el peso de la prueba sobre la ausencia de peligros que pueda causar una actividad “recae en el proponente de la misma, no en la ciudadanía” y existe la obligación de, antes de iniciar una actividad, “evaluar una amplia gama de alternativas, in-cluyendo la alternativa de no hacer nada”.(43)
Los recurridos manifiestan que la DIA-F incumple con uno de los propósitos principales de este tipo de documento ambiental al no considerar diversas alternativas al pro-yecto que son viables y reducirían el impacto negativo so-bre el ambiente y sus comunidades, pues no conllevarían la transportación del combustible por grandes extensiones de terreno pobladas. Entre éstas mencionaron: la conversión *941 de las centrales existentes a plantas para la quema de gas natural; el uso de barcazas en alta mar como tanques de gas natural, que se suministraría a las centrales mediante un sistema de boyas, y el inicio de la transición hacia sis-temas de energía renovable, como los paneles solares y los molinos de viento.(44)
B. Menoscabo económico
Diversos vecinos también reclamaron daños económicos relacionados con su derecho a disfrutar su propiedad, su potencial para generar ingresos y los efectos perniciosos sobre sus cosechas.
La finca de 22 cuerdas de los esposos Cortés Lugo y Colón Matos, en Utuado, está totalmente sembrada de café y cítricos. De la venta de estos productos agrícolas es que la Familia Cortés Colón recibe su sustento. El matrimonio Guzmán-Oquendo y sus 3 hijos también tienen su finca de 34 cuerdas en Utuado sembrada de café, verduras y frutos menores. Esos cultivos representan su trabajo de muchos años y su fuente de ingresos.(45) Por su parte, los residentes *942 del barrio Portugués, en Adjuntas, tienen siembras de fru-tos menores, que incluyen plátanos, guineos, chinas, chi-nas mandarinas, yautías, malangas, chayotes, aguacates y café, que utilizan para el consumo de sus familias, que han requerido inversión económica y de labor. De perderse, ten-drán que adquirir esos productos en el mercado.(46) El mismo problema enfrenta Jesús García Oyóla, quien tiene una finca de una cuerda y media en el Barrio Hato Viejo de Arecibo, en la que se encuentra su casa y en la que tiene siembras de mamey, carambola, guineos y plátanos, que utiliza para el consumo de su familia. (47) En nuestro orde-namiento, los daños a cosechas, árboles y otros elementos naturales en una propiedad son reconocidos como daños ambientales patrimoniales.(48)
Por otro lado, Virgilio Cruz Cruz, residente del Barrio Factor 2 en Arecibo, indicó que el Gasoducto pasaría a me-nos de 69 metros de su hogar y recibió una notificación de la A.E.E. que dice que su propiedad se verá afectada por el paso de la tubería de gas natural.(49) Trinita Alfonso Viuda de Folch, vecina del Barrio Salto Abajo en Utuado, así como Alex Noel Natal Santiago y Miriam Negrón Pérez, residentes en el Barrio Salto Arriba en Utuado, señalaron *943 que el Gasoducto pasaría por sus casas y que ya la A.E.E. les envió cartas para informarles que podrían ser expro-piados.(50) El señor Natal Santiago depuso en las vistas públicas sobre la propuesta de Vía Verde.(51) Por su parte, Iván Carlos Vélez Montero, vecino de la Calle Cabrera en Utuado, tiene un terreno donde planifica construir su casa. Según se expone en la DIA-F de Vía Verde, el Gasoducto pasaría justo por ese terreno.(52) Además, Luis Rodríguez Cruz, uno de los portavoces del Comité Barrio Portugués, informó ante este Tribunal que los funcionarios de la A.E.E. y personal contratado por esta peticionaria le ban requerido copia de las escrituras de su finca y acceso a ésta en diversas ocasiones con el fin de expropiarlo, y, ante su negativa, la A.E.E. presentó el recurso A.E.E. v. Rodríguez Cruz, al amparo de la Ley de Expropiaciones, para que se le ordene permitir acceso a su propiedad.(53)
La A.E.E. y la J.C.A argumentan que, una vez se apruebe la alineación del proyecto de gasoducto estable-cida en la DIA-F de Vía Verde y comience el proceso de expropiación, los recurridos no tendrán un interés propie-tario o de seguridad sobre sus residencias, puesto que es-tarán obligados a abandonarlas.(54) Aparte del cinismo ad-ministrativo que este argumento revela, contiene implícita su propia negación, pues la inminencia de la expropiación hace más patente el daño que da derecho a cuestionar los *944 procesos y la información utilizados para aprobar el pro-yecto en el cual se basa el fin público que justificaría la expropiación. (55)
C. Angustias mentales
El proceso que se está llevando a cabo a partir de la aprobación de la DIA-F también ha afectado la salud emo-cional y la tranquilidad mental de los vecinos. Nuestro or-denamiento reconoce como daños aquellas lesiones mora-les, mentales o espirituales que producen los sufrimientos y las sensaciones de dolor, tristeza, miedo, ansiedad, humi-llación y pérdida de paz que afecten la salud, el bienestar y la felicidad de una persona. Estas angustias, que son in-cluso compensables económicamente, causan una pertur-bación anímica de naturaleza intangible pero latente.(56) Por eso, no pueden ser tratadas como penas insignificantes o meros temores.
María Cruz Rivera, quien vive junto a su hija en un terreno de 1.46 cuerdas en el cual hay una quebrada en el Barrio Salto Arriba de Utuado, alegó en el escrito de Revi-sión que “la ruta propuesta del Gasoducto estará pasando al frente de su casa, lo que le causa temor por su seguri-dad, lo que la mantiene en un estado constante de ansie-dad e inseguridad”.(57) La señora Cruz Rivera depuso en las vistas públicas sobre Vía Verde.(58) Otros que están ex- *945 perimentando “mucha ansiedad y desasosiego” a causa de los procesos que se están llevando a cabo a partir de la aprobación de las declaraciones de impacto ambiental de Vía Verde son Cristóbal Orama Barreiro y Haydée Irizarry Medina. Ellos tienen una propiedad de 6 cuerdas en el Barrio Salto Abajo de Utuado y el Gasoducto pasaría por el paseo de la Carretera 10, justo frente a su casa. Un funcio-nario de la A.E.E. le informó al recurrido Orama Barreiro que el tubo de gas natural pasaría entre 50 y 70 pies de su hogar. Además, le solicitó que firmara un documento para realizar estudios en su propiedad.(59)
Los residentes del Barrio Portugués de Adjuntas, repre-sentados por los señores Cabán Cañedo, Rodríguez Cruz y Rivera Rodríguez, indican en el escrito de revisión que la mayor parte de ellos son personas de edad avanzada, que sufren de condiciones médicas como alta presión, proble-mas cardiacos y Alzheimer. Algunos de ellos están encama-dos o no pueden caminar sin ayuda. Destacan que la im-plementación del proyecto Vía Verde, que se hace posible luego de la aprobación de la DIA-P requerida, se está lle-vando a cabo a través de un amplio despliegue de funcio-narios que miden el área y discuten sobre expropiaciones, lo que “les ha alterado la paz de la que por muchos años disfrutaban, antes del anuncio” del Gasoducto.(60) Mani-fiestan que: “La incertidumbre de lo que sucederá con sus *946 propiedades, la cercanía del gasoducto y los peligros que éste representa les ha causado angustia, ansiedad y desasosiego. La posibilidad de verse obligados a relocali-zarse les causa mucha preocupación”.(61) Esta situación les ha provocado angustias emocionales y un miedo colectivo que ha hecho necesario que el Comité Barrio Portugués coordine servicios psicológicos para sus residentes.(62) Esto representa un daño espiritual actual, concreto y directa-mente relacionado con la aprobación de la DIA-F.
El daño es todavía más palpable, ya que los vecinos del barrio Portugués detallan que, desde el comienzo de la implementation del proyecto Vía Verde, varios helicópteros han estado sobrevolando sus residencias, a muy bajas al-turas y de modo constante. “Los fuertes vientos y ruidos que producen las aspas y motores de los helicópteros han causado temor, ansiedad y falta del descanso necesario, so-bre todo a los residentes con condiciones de salud serias”.(63) El sobrevuelo de los helicópteros que ocurre ac-tualmente en esta comunidad les causa no solo un daño emocional por la ansiedad y la intranquilidad que produce, sino también daños físicos por la falta de descanso y las posibles lesiones a la audición debido a la exposición a un sonido muy fuerte durante un tiempo prolongado.
Hemos indicado que la Ley sobre Política Pública Am-biental provee protecciones ante efectos negativos sobre la calidad de vida de los residentes, incluyendo los producidos por el ruido y el polvo.(64) Además, el ruido continuo atenta contra el disfrute del domicilio familiar y la vida privada.(65) Esto no se debe tomar livianamente en Puerto *947 Rico, donde la protección de la vida privada y familiar es de rango constitucional, y el derecho a la intimidad opera ex proprio vigore.(66) No podemos olvidar que nuestra Cons-titución protege el disfrute de la tranquilidad, la seguridad y la sensación de bienestar en el seno del hogar, que nues-tro ordenamiento considera “un castillo y fortaleza tanto para su defensa ... como para su reposo”.(67)
D. Problemas de seguridad
Todas las personas que están impugnando la DIA-F han expuesto, unos en mayor grado que otros, que su entorno, sus propiedades y sus vidas se encuentran en peligro a partir de la aprobación de ese documento y a raíz de lo que las determinaciones contenidas en éste permiten. Esto les está provocando angustias mentales y representa una amenaza cercana de daños ambientales y patrimoniales. Por eso, discutimos de modo separado el problema de segu-ridad que enfrentan los vecinos y las vecinas ante el inmi-nente paso del gasoducto Vía Verde cerca de sus residencias.
Cabe mencionar que todos los vecinos incluyeron sus direcciones residenciales completas en el escrito de revisión, incluyendo números de carretera y de kilómetro en el caso de las áreas rurales y nombre de calle y número de casa en el caso de las áreas urbanas. Asimismo, la mayor parte de los recurridos anotaron a cuántos metros de sus propieda-des pasaría el Gasoducto. Los vecinos que son portavoces de las organizaciones comunitarias recurridas también in-cluyeron esa información. De esa forma, se establece clara-mente la proximidad entre el lugar en el que se encuentran los vecinos y el lugar donde se desarrollará el proyecto, y se *948 atiende la preocupación expresada en Surf rider sobre la necesidad de colocar al foro judicial en posición de poder determinar la probabilidad de que se sufra un efecto ad-verso, proveyendo información sobre la localización.(68)
El Gasoducto pasaría a menos de 19 metros de las pro-piedades de Maribel Torres Carrión, Hernán Padín Jimé-nez y Rosa Serrano González, ubicadas en el Barrio Factor 2 de Arecibo.(69) Sabrina Padua Rullán, vecina del mismo barrio, indicó que el Gasoducto pasaría a menos de 34 metros de su residencia.(70) Margarita Forestier Torres, Ernesto Forestier Torres y Carmen Juarbe Pérez, quienes componen la Sucesión de Ada Torres y son residentes en El Roblegal en Utuado, así como Fernando Vélez Vélez, ale-garon que el Gasoducto pasaría a menos de 50 metros de su propiedad.(71) Gilberto Padua Rullán, residente en el Barrio Factor 2 en Arecibo, señaló que el Gasoducto pasaría a menos de 51 metros de su vivienda.(72) Cándida Cruz Cruz y Amparo Cruz Cruz, vecinas del Barrio Factor 2 en Are-cibo, indicaron que el Gasoducto pasaría a menos de 69 metros de sus hogares.(73) Alejandro Saldaña Rivera, Dixie Vélez Vélez, Dylia Santiago Collazo y Miriam Morales González, todos vecinos de El Roblegal en Utuado, aseve-raron que el Gasoducto pasaría a menos de 100 metros de *949 sus residencias.(74) El Gasoducto pasaría a menos de 200 metros de la residencia del señor García Oyóla y de un caño de agua dulce cercano a ésta, en el Barrio Hato Viejo de Arecibo, por lo que alegó que siente ansiedad y preocupa-ción por su seguridad.(75) Maritza Rivera Cruz, vecina del Barrio Factor 2 en Arecibo, señaló que el Gasoducto pasa-ría a menos de 300 metros de su residencia.(76) Aristides Rodríguez Rivera, Ada Rodríguez Rodríguez y William Mo-rales Martínez, vecinos de la calle Cabrera en Utuado, in-dicaron que sus residencias se encuentran en un área crí-tica, a 720 metros de donde pasaría el gasoducto.(77) El señor Rodríguez Riyera fue deponente en las vistas públi-cas sobre el proyecto.(78)
De igual forma, los vecinos de Colinas de San Andrés, en la Carretera 10 en Utuado, expusieron que el gasoducto Vía Verde pasaría frente a sus residencias, según la pro-puesta discutida en la DIA-F del proyecto. En ese grupo se encuentran Iván Vélez González, Francisca Montero Colón y Sol María de los Angeles Rodríguez Torres.(79) Francisco Ruiz Nieves y Silvia Jordán Molero, vecinos del Barrio Salto Arriba en Utuado, también indicaron que el Ga-soducto pasaría frente a sus residencias.(80) Emma Gonzá- *950 lez Rodríguez, quien tiene su residencia y finca en el Sector La Pica en Arecibo, así como Samuel Sánchez Santiago y Raquel Ortiz González, vecinos del mismo sector, expusie-ron que el Gasoducto pasaría por frente y por detrás de sus propiedades.(81) También se encuentran entre las personas recurridas, 3 residentes de Toa Baja que habitan en el área crítica de peligrosidad del Gasoducto, en zonas densa-mente pobladas de Levittown: Elizabeth Nazario Rodrí-guez, de la urbanización Levittown Lakes; Lydia Muñoz Mercado, de la 3ra Sección de Levittown, y Samira Yassin Hernández, de la urbanización Valparaíso.
Los recurridos alegaron que los cambios de alineación de la tubería que se reflejan en la DIA-F, la acercan más a las residencias en diversas áreas.(82) Ninguno de ellos, a diferencia de los que mencionamos en la sección sobre da-ños económicos, indicó en el escrito de revisión haber reci-bido notificación de la A.E.E. informando que podría ser expropiado o que su residencia podría verse afectada, a pesar de que todas las residencias están en áreas muy cer-canas a la ruta del Gasoducto. Algunas, incluso, se encuen-tran en el área de despejo de alto riesgo de 150pies (45.72 metros) identificada por la Autoridad. La A.E.E. alega que todas las propiedades en esta zona de alta peligrosidad se-rán expropiadas. (83)
Sobre el área d.e despejo entre el Gasoducto y las vivien-das, los recurridos expusieron en el escrito de revisión pre-sentado al Tribunal de Apelaciones que esta distancia no representa la verdadera zona de alta peligrosidad. Expli-caron que la agencia se basó en un estudio que utiliza como *951 punto de referencia áreas escasamente pobladas, que no corresponden a las zonas del área metropolitana de alta densidad poblacional, como Levittown, por las que trans-currirá Vía Verde. Además, se adoptó una medida que no contempla el cálculo del área de acuerdo con las caracterís-ticas de Vía Verde. En cuanto a esto, explicaron que el Capítulo 5.11.2(j) de la DIA-F sobre Análisis de Riesgos y Medidas de Seguridad dispone que la distancia de despejo de 150 pies se seleccionó de acuerdo con el estudio “A Model for Sizing High Consequence Areas Associated with Natural Gas Pipelines”, realizado en el 2000, que proveyó una fórmula para calcular el radio de impacto potencial donde una falla en la tubería podría tener altas consecuen-cias en la vida y la propiedad. Sin embargo, la DIA-F más adelante indica que, aunque el cálculo para Vía Verde se-gún el estudio es de 422 pies (128.63 metros), las conse-cuencias fatales solo alcanzarían los primeros 150 pies.(84) Los recurridos indicaron que la DIA-F no explica por qué se utiliza la distancia de ciento cincuenta pies en lugar de la de 422 pies que resulta de la fórmula que recomienda el estudio científico. Además, señalaron que, según un estu-dio que presentó en las vistas públicas el Dr. Neftalí García Martínez, de Servicios Científicos y Técnicos, la distancia de despejo debía ser mayor a los 422 pies. De acuerdo con las fórmulas matemáticas explicadas por García Martínez, esto se debe a que la distancia de 422 pies se calculó to-mando como factores unos números de presión de gas natural y diámetro de tubería que no corresponden a los de Vía Verde; se realizó a base de una presión en la tubería de 650 libras por pulgada cuadrada, pero Vía Verde está dise-ñado para aguantar hasta 1,450 libras por pulgada cua-drada, y, a mayor presión del gas, mayor es la distancia de *952 despejo que se requiere como medida de seguridad.(85) Los recurridos también discutieron en su escrito de revisión un estudio realizado por los arquitectos Patrick Urbain y Ricardo Miranda que determina que la zona real de peligro es de 800 metros (2,624.67 pies) de ancho e incluye 25,877 viviendas, además de edificaciones no residenciales. La medida se fundamentó en el alcance de la onda expansiva de calor e incendio que se registró en ciudades de Estados Unidos y otros países donde explotaron líneas de transmi-sión de gas natural con características similares a las pro-puestas para el gasoducto Vía Verde, entre 2004 y 2010.(86)
Además, los recurridos basaron sus preocupaciones res-pecto a su seguridad personal en información de conoci-miento general histórico sobre el saldo de explosiones de tuberías de gas natural en distintas ciudades, entre las cuales mencionaron: San Bruno, California, donde murie-ron 8 personas y se destruyeron 38 casas en el 2010; Ber-genfield, Nueva Jersey, donde 3 personas murieron y un edificio fue declarado pérdida total en 2005; Carlsbad, Nuevo México, donde murieron 12 personas y hubo exten-sos daños a la propiedad en el 2000, y Bellingham, Washington, donde murieron 3 menores de edad y la planta de agua de la ciudad sufrió daños millonarios en 1999. Estos accidentes y otros descritos en el escrito de revisión se de-tallan en los informes de accidentes de sistemas de gas natural de la National Transportation Safety Board. Asi-mismo, los recurridos incluyeron datos de la agencia federal para la regulación de gasoductos, la Pipeline and *953 Hazardous Materials Safety Administration, que señalan que en Estados Unidos, donde sólo hay 100 inspectores para 2.3 millones de millas de gasoductos, se han regis-trado sobre 2,840 accidentes significativos desde 1990. Se-gún los datos de las agencias federales, entre 1989 y 1998, murieron 226 personas y 1,330 resultaron heridas en Es-tados Unidos como resultado de accidentes en gasoductos. Un informe del Congressional Research Service indica que los errores, las fugas, las fallas y las explosiones relaciona-dos con gasoductos cobran un promedio de 17 vidas anual-mente en Estados Unidos.(87) De esa forma, los recurridos demostraron que sus temores son reales y los fundamenta-ron en sucesos históricos y en estudios científicos.(88)
De otra parte, Miguel Báez Soto, así como Aristides Ro-dríguez Rivera y Ada Rodríguez Rodríguez, expusieron que transitan diariamente por la Carretera 10, que es parte de la ruta de Vía Verde descrita en la DIA-F.(89) Resulta con-tradictorio e incomprensible que la Opinión mayoritaria indique que el mero hecho de transitar por un tramo cer-cano al proyecto no confiere legitimación cuando en Surfri-der se advirtió que una de las razones por las cuales no se podía auscultar si el peticionario sufriría un efecto adverso era que “[n]i siquiera sabemos si el señor Richter tiene que transitar por el área cercana al proyecto”.(90)
En la sección sobre impactos geológicos del escrito de revisión, los vecinos advirtieron que la DIA-F dejó fuera estudios indispensables para proteger la seguridad pública que fueron requeridos por el grupo de Asesoramiento Cien-tífico de la J.C.A. Además, resaltaron que los mapas geoló- *954 gicos utilizados en el estudio eran de la década de 1970 y no fueron corroborados por estudios de campo, por lo que no calculan adecuadamente los riesgos reales sobre terre-motos, maremotos, inundaciones, licuefacción y susceptibi-lidad a deslizamientos.(91) Estas consideraciones son im-portantes para las personas que residen y transitan por el área. Asimismo, los recurridos señalaron que el estudio de riesgos en la DIA se realizó de forma fragmentada, vio-lando la obligación de discutir el impacto conjunto, y no contempló el proyecto de vender gas natural directamente a clientes comerciales e industriales mediante conexiones en el trayecto del Gasoducto.(92)
El escrito de revisión administrativa que presentaron los recurridos incluye también una sección sobre seguridad en la cual se detallan los riesgos a la vida y la propiedad de las personas que viven en zonas aledañas a la ruta pro-puesta del Gasoducto y que no se consideraron o se consi-deraron inadecuadamente en la DIA-F de Vía Verde, per-mitiendo que las acciones subsiguientes sobre el proyecto los ignoren. Señalaron que no se incluyó un análisis de los peligros que se enfrentarían durante todas las fases del proyecto, incluyendo lo concerniente al mantenimiento de la tubería, el almacenaje y la transportación del gas natural.(93) Indicaron que, ignorando las recomendaciones del grupo de asesoramiento científico de la propia J.C.A., tampoco se consideraron accidentes que pudieran resultar de fenómenos naturales como huracanes y terremotos, de *955 errores humanos ni de vandalismo en las trincheras abier-tas de la tubería, y que no se incluyeron planes de contin-gencia para estas situaciones ni ante emergencias por escapes de gas natural.(94) Todos estos señalamientos sobre la seguridad de los vecinos ameritan, cuando menos, que se les reconozca legitimación activa para que los tribunales puedan ponderar sus alegaciones en contraposición con las de los proponentes del Gasoducto.
E. Relación de los daños con la aprobación de la DIA-F
La Opinión mayoritaria subraya que el “daño tiene que ser causado por la decisión administrativa de la cual se recurre” y la legitimación se evalúa con referencia a ésta.(95) Sin embargo, limita su análisis al contenido de una sección del escrito de revisión administrativa que describe las maneras en que cada recurrido se relaciona con el pro-yecto Vía Verde. De esa sección, titulada “Identificación de las Partes”, colige, sin referirse a las demás secciones del escrito, que los vecinos no tienen legitimación activa, por-que supuestamente no especifican cómo sus daños derivan de la aprobación de la DIA-F que se impugna. Aunque en-tendemos que los daños alegados en esta sección que describe a las partes son suficientes, advertimos que el escrito se debe examinar de forma íntegra.
La mayoría hace caso omiso del resto del escrito de re-visión, que incluye una discusión pormenorizada sobre las deficiencias de la DIA-F y cómo éstas afectan a todos los recurridos o a algunos de estos, dependiendo del área de la DIA-F que se analiza.(96) Esto a pesar de que, cuando se *956 alega que un peticionario no tiene legitimación, nuestro ordenamiento exige a los tribunales analizar sus reclamos del modo más favorable para éste, así como presumir que sus alegaciones son ciertas.(97) Además, los recurridos ex-plican en su alegato que
... una DIA incompleta o deficiente, como los aquí recurridos plantean que ocurre con la elaborada para el Gasoducto, falla en permitir que la agencia proponente tome en consideración los impactos ambientales significativos del proyecto antes de tomar una decisión en torno a su viabilidad, al igual que no logra advertir a la ciudadanía de las consecuencias ambienta-les y sociales del desarrollo del proyecto. Es de allí que surge el daño irreparable que describe este Tribunal, daño que su-pera con creces el tipo de daño que debe alegar una parte para demostrar que tiene legitimación activa para presentar un re-curso de revisión como el de la presente controversia. Ello también sirve para explicar por qué, y contrario a lo alegado por la peticionaria A.E.E., este Tribunal ha resuelto inconta-bles controversias sobre el cumplimiento de documentos am-bientales elaborados por agencias proponentes con la [Ley de Política Pública Ambiental], en vez de concluir que el daño alegado por los allí recurrentes era insuficiente para demos-trar que tenían legitimación activa. (98)
Es ilógico analizar el daño sufrido o la posibilidad de sufrir un daño como consecuencia de la aprobación de un documento sin razonar cuáles son las implicaciones probables de ese escrito. Es decir, no podemos entender que la aprobación de la DIA-F no va a provocar un daño porque en el texto de la DIA no se encuentra la orden expresa de expropiar, de demoler, de talar, de construir o de transpor-tar un combustible peligroso a pocas millas de un hogar. No considerar estas consecuencias de la aprobación de la *957 DIA equivaldría a hacer un análisis en el abstracto, con-trario a la finalidad de la decisión en Surfrider, supra, que añadió requisitos a la doctrina de legitimación, según ex-puso, con el propósito de eludir lo hipotético. Lo cierto es que la aprobación de la DIA-F permite que se lleven a cabo las acciones que están afectando o afectarán adversamente a quienes la impugnan.
Como explica la J.C.A. en su recurso, la DIA-F no repre-senta la autorización final para llevar a cabo el proyecto, pero le permite a las agencias decidir si procede otorgar los permisos subsiguientes, pues les asegura que se evaluaron todos los posibles impactos ambientales y que se les ha provisto toda la información que necesitan para tomar su decisión. (99) No se puede desvincular la acción cuestionada en el presente recurso, la aprobación de la DIA-F del ga-soducto Vía Verde, de los permisos para la construcción y operación de ese proyecto, con el fin de argumentar que la aprobación del documento ambiental no conlleva daños.(100) Ello es contrario a toda lógica, ya que las etapas de permi-sos de construcción y uso del proyecto que siguen a la DIA-F van a depender de la evaluación de las consecuen-cias ambientales significativas realizada en ésta.(101) Re-querir que se demuestre que la aprobación misma de la DIA, como acto aislado, causa daños más directos que los *958 particularizados aquí equivaldría a decretar irrevisables las aprobaciones de documentos ambientales.(102)
Es cierto que, como expresamos en Misión Ind. P.R. v. J.C.A. existen remedios para atender daños ambientales no previstos en la DIA o daños que surjan de una declara-ción que no fue aprobada adecuadamente, remedios que representan alternativas viables siempre y cuando se per-mita ejercer las acciones correspondientes para hacerlos valer. Ello no significa que los ciudadanos no tengan legi-timación en etapas anteriores del proceso, como lo es la de la aprobación de la DIA, para presentar reclamaciones ante violaciones a la política pública ambiental.(103) Cuando en aquel caso mencionamos que la DIA es un instrumento de planificación y su aprobación no es una carta blanca para dejar de tomar medidas en protección del ambiente en etapas más adelantadas del proyecto, lo hicimos con el fin de aclarar que la DIA no exime a las agencias de evitar los efectos ambientales adversos no contemplados en ésta y que su aprobación no se debe interponer como defensa contra una persona que alega que el avance del proyecto va en detrimento del ambiente.(104) A diferencia de lo que sugiere la Opinión mayoritaria, de ninguna manera Misión Ind. v. J.C.A., limita la capacidad de unos vecinos con interés para impugnar una DIA.
En casos anteriores, hemos señalado que las agencias fiscalizadoras, como la J.C.A., tienen el deber de evitar, mediante una intervención temprana, que la prisa por completar las obras públicas en el menor tiempo posible afecte adversamente el medioambiente.(105) Por el carácter permanente de los daños ambientales, las violaciones a los *959 procedimientos de declaración de impacto ambiental se consideran daños irreparables de por sí y quien sufre ese daño irreparable en casos ambientales de interés público es el Pueblo.(106) Por lo tanto, siguiendo lo dispuesto en nuestro ordenamiento, todas las personas que impugnaron la DIA-F por ser insuficiente, según la Ley de Política Pú-blica Ambiental y del mandato constitucional de protección del ambiente, están legitimadas para ello. Pero, aun si ig-norásemos esas claras disposiciones, todos los daños discu-tidos demuestran que los recurridos, o al menos uno de ellos —lo que sería suficiente — , tienen legitimación. Asi-mismo, los vecinos reclamaron en el momento necesario para detener los daños que estaban sufriendo y evitar otros que probablemente sufrirían, antes de que fueran irremediables. Los recurridos cumplieron con el requisito de alegar un daño real, concreto, no especulativo, específico y particular en su primera comparecencia ante el Tribunal de Apelaciones, mediante todo lo planteado en su escrito de revisión.(107)
*960 II
Los requisitos de justiciabilidad, uno de los cuales es la legitimación activa, son utilizados por los tribunales “para delimitar su propia jurisdicción ... y no lanzarse a resolver cuestiones hipotéticas o planteadas dentro de un contexto inadecuado”.(108) El propósito primordial de determinar si una persona tiene legitimación es asegurarse de que ésta tiene un interés genuino en la controversia planteada que es adverso al de la otra parte y que el remedio que se dicte afectará su situación juridica.(109) Por eso, los criterios que se utilizan para determinar si una parte tiene legitimación activa funcionan como un filtro para comprobar que la persona que está ante el tribunal tiene tanto interés en el caso que gestionará su causa de acción de forma vigorosa con el fin de que el foro judicial cuente con todos los elementos de juicio necesarios para adjudicarla de la manera más justa, según el ordenamiento jurídico aplicable.(110)
Según alegan los recurridos, y se observa a través de los documentos contenidos en el expediente del presente caso, “ [difícilmente pueda encontrarse en Puerto Rico alguna otra parte que esté dispuesta a litigar este asunto con el interés y la adversidad que tienen las partes aquí compa-recientes hacia las determinaciones tomadas por el Estado”.(111) La participación activa que han tenido los re-curridos durante todo el proceso de evaluación del proyecto de gasoducto propuesto, así como los recursos que han pre-sentado ante los tribunales diligentemente en busca de que se reconozca su derecho a oponerse y se escuchen sus pre- *961 ocupaciones y sugerencias ante una acción gubernamental que les afecta directamente, demuestran el interés particular que tienen en la presente controversia.(112)
Aunque un interés legítimo por sí solo no confiere legi-timación activa, ese interés, que puede ser de tipo econó-mico, social, ambiental u otro, es un ingrediente que abona significativamente al derecho a acudir en revisión judicial de una acción administrativa.(113) El interés genuino en la controversia es la base de los requisitos de legitimación y los recurridos han demostrado tenerlo. También han con-firmado que su interés es adverso al de las peticionarias, por lo que se esforzarán por presentar toda la información necesaria para la impugnación de la DIA-F y tramitarán su causa de acción hasta el final. Asimismo, han acreditado que el remedio que se dicte afectará su situación jurídica, pues la cancelación del proyecto o los cambios a éste que consigan a través de la impugnación de la DIA-F puede librarlos de ser expropiados de sus hogares y terminar con los temores que los aquejan sobre los efectos adversos a su medioambiente, sus cosechas y su seguridad personal. Así, cumplen con el requisito general de la doctrina de justiciabilidad.
En García Oyola v. J.C.A. este Tribunal rechazó el plan-teamiento de la J.C.A. y la A.E.E. sobre la falta de legiti-mación activa de los ciudadanos y determinó que los resi-dentes tenían capacidad jurídica para presentar el recurso, pues su interés en la controversia respondía a considera-ciones ambientales, estéticas y de salud legítimas; existía relación entre los daños que alegaban y la determinación de la Junta; habían figurado como deponentes en las vistas *962 públicas, y se amparaban en la Ley sobre Política Pública Ambiental.(114) Las mismas circunstancias están presentes respecto a los recurridos en este caso.
La doctrina de legitimación activa establece cuatro re-quisitos con los que debe cumplir la parte demandante, “en ausencia de un estatuto que expresamente confiera legiti-mación activa a ciertas personas”.(115) Por eso, la primera pregunta que se deben hacer los tribunales al examinar la legitimación de un demandante es si alguna ley le confiere una causa de acción. En este caso, los recurridos están le-gitimados estatutariamente de acuerdo con el derecho a solicitar revisión judicial que provee la Ley de Procedi-miento Administrativo Uniforme (L.P.A.U.) a cualquier parte adversamente afectada, en el marco de un proceso administrativo flexible. No obstante, aunque los recurridos en este caso tienen la capacidad para demandar por conce-sión legislativa, igualmente han demostrado que cumplen con los requisitos de legitimación elaborados para casos en que no existe tal autorización. Esos criterios son: haber sufrido un daño claro y palpable; que ese daño sea real y preciso, no abstracto ni hipotético; que exista un nexo causal entre ese daño alegado y la causa de acción que se pre-senta, y que la causa de acción surja al amparo de la Cons-titución o de alguna ley.(116) Todos los vecinos, según se ha discutido, han sufrido o están en riesgo inminente de sufrir daños claros y palpables, que son reales, precisos y no hipotéticos. Además, los daños que los recurridos alegaron en su escrito de revisión están claramente relacionados con su impugnación de la DIA-F, pues sin la aprobación de ésta no se podría construir y operar el gasoducto Vía Verde. *963 Finalmente, la causa de acción surge al amparo de la dis-posición constitucional de conservación ambiental y de la Ley sobre Política Pública Ambiental, y se tramita según dispuesto en la L.P.A.U. y la Ley Núm. 76-2000.
En el caso de organizaciones que demandan a nombre de sus integrantes, éstas deben probar que los intereses que se pretenden proteger están relacionados con los obje-tivos de la asociación; que los miembros tendrían legitima-ción activa para demandar a nombre propio, y que el reme-dio solicitado no requiere la participación individual de los miembros en el pleito.(117) Las asociaciones que se encuen-tran entre los recurridos también cumplen con los requisi-tos que impone la doctrina de legitimación para grupos que demandan en representación de sus miembros.
Los objetivos de las organizaciones Comité Barrio Por-tugués en Contra del Gasoducto y Comité Utuadeño en Contra del Gasoducto no pueden estar más relacionados con los intereses que pretenden proteger, pues se trata de grupos comunitarios que se crearon precisamente para defender a los vecinos que se estaban viendo o se verían ad-versamente afectados por el Gasoducto y para informar so-bre el desarrollo y las consecuencias del proyecto Vía Verde. Los miembros de la organización en su carácter individual también tienen legitimación, pues son los residen-tes de los barrios adyacentes al proyecto y presentan los daños ya discutidos. La opinión mayoritaria identifica como una deficiencia que no se incluyó una lista todos los miembros de ambos grupos. La realidad es que en ninguno de los casos sobre legitimación activa de asociaciones que ha visto este Tribunal se ha requerido que se incluya una lista de todos los miembros de la organización para poner al foro en posición de revisar si alguno de los integrantes tiene legitimación.(118) Una descripción de los objetivos de *964 la agrupación y una alegación sobre los daños de al menos uno de sus miembros siempre han sido suficientes. En este caso, las dos organizaciones incluyeron los nombres, las direcciones y los daños específicos de sus portavoces, miembros de las asociaciones que también son vecinos recurridos. Por último, la participación de cada uno de los integrantes no es necesaria para este tipo de “acción públi-ca”, que busca revisar que una acción administrativa haya cumplido con la normativa ambiental y cuyo resultado va a beneficiar a todos los integrantes de la organización por igual sin que sea necesario evaluar compensaciones en da-ños para cada uno ni asuntos similares.(119)
Es evidente que los recurridos cumplen con todos los requisitos de legitimación activa para que los tribunales puedan atender su solicitud de revisión judicial. No hay tal ausencia de caso o controversia que impida que un tribunal considere la petición en sus méritos. Todo lo contrario. Como indicamos en Misión Ind. P.R. v. J.C.A., “nos toca verificar que la Junta de Calidad Ambiental haya exami-nado adecuadamente todas las consecuencias ambientales significativas que sean razonablemente previsibles y que haya discutido de igual modo todas las alternativas que razonablemente existan a la acción contemplada por la agencia proponente. De esta manera, ejercemos nuestra responsabilidad de velar por que la Junta haya dado cum-plimiento al esquema estatutario y reglamentario que le rige, y la de procurar que se observe la política ambiental del país que, como hemos señalado ya, es de origen constitucional”.(120) Negarnos a acoger este recurso, utili-zando erróneamente la doctrina de legitimación activa, im-plica, no solo cerrarle las puertas de los organismos de jus-ticia a unos ciudadanos con interés legítimo en una *965 situación de alto interés público que les afecta directa-mente, sino también rehuir de nuestro deber como el más Alto Foro judicial del País.
h-i I — ! H — 1
El rechazo a la atención de los reclamos de los vecinos que supone la decisión de una mayoría de este Tribunal es aún más alarmante si se consideran las circunstancias en las que surge la controversia de este caso. La DIA-F del gasoducto Vía Verde es un paso imprescindible hacia la construcción y operación de un proyecto que se ha desarro-llado y tramitado de acuerdo con una declaración de “emer-gencia energética” mediante orden ejecutiva y de las dispo-siciones de la Ley Núm. 76-2000.
La Ley Núm. 76-2000 dispensa a las agencias y corpo-raciones públicas relacionadas con la concesión de permi-sos, endosos y consultas de cumplir con diversas disposicio-nes que reglamentan los procedimientos en la J.C.A., la Administración de Reglamentos y Permisos (A.R.Pe.), la Junta de Planificación y los municipios, así como con cier-tas normas de la L.P.A.U., en casos de proyectos que surjan como consecuencia de estados de emergencia declarados mediante orden ejecutiva. El propósito de esa ley es lograr “la más eficaz conservación de los recursos existentes y el mayor desarrollo y aprovechamiento de los mismos para proteger y garantizar la salud, la seguridad pública y el bienestar de todo el Pueblo de Puerto Rico”.(121) Con ese fin, establece procedimientos especiales para otorgar permisos y acorta los términos para presentar endosos, para evaluar documentos ambientales y consultas de ubicación y para solicitar revisión judicial. Asimismo, otorga prioridad a los proyectos que se lleven a cabo para atender la emergencia y confiere al Gobernador la potestad de promulgar, enmen- *966 dar y revocar reglamentos, órdenes, contratos y convenios de manera que se facilite la respuesta a la emergencia.(122)
Ante las amplias facultades que concede esa ley res-pecto a un tema que requiere tanta cautela y ante la re-ducción considerable de las garantías de participación ciu-dadana y transparencia gubernamental que permite, es importante recalcar que un estado de emergencia es un es-tado excepcional. El historial legislativo de la Ley Núm. 76-2000 demuestra que la Asamblea Legislativa tuvo muy en cuenta esa idea.(123) Los comentarios de las agencias en torno al proyecto que se convirtió en esta ley revelan, ade-más, la preocupación por que ésta no se utilizara inapro-piadamente para casos que no representaran emergencias ni permitiera desarrollos sin la planificación debida.(124)
La Legislatura intentó subsanar esa deficiencia utili-zando un lenguaje más especificó en la Exposición de Mo-tivos de la Ley y expresiones que denotaban mayor severi-dad en la definición de “emergencia”. Así, ésta pasó de ser “cualquier evento o problema de infraestructura que afecte o pueda afectar la salud pública, la seguridad o el bienes-tar general de la ciudadanía”,(125) en el proyecto original, a “graves problemas de deterioro en la infraestructura física de prestación de servicios esenciales al pueblo, o que ponga *967 en riesgo la vida, la salud pública o seguridad de la pobla-ción o de un ecosistema sensitivo”.(126)
Asimismo, se redujo el término por el cual se podía de-cretar la emergencia de un año a seis meses y, en vez de permitirle a la Asamblea Legislativa prorrogar el período de emergencia por términos adicionales de un año a peti-ción del Gobernador, se incluyó una disposición para per-mitirle a la Legislatura pasar juicio sobre la declaración de emergencia y delimitarla, en el período de seis meses.(127) Para que la Asamblea Legislativa pueda realizar ese aná-lisis, se requiere que la orden ejecutiva que declara la emergencia establezca la intensidad y extensión de los da-ños, su área geográfica y las obras públicas que deben pro-tegerse con urgencia.(128) Mediante esa disposición, la Le-gislatura debía asegurarse de que la orden ejecutiva se limitara a las situaciones que busca atender la Ley, que son aquellas que requieren soluciones inmediatas.(129)
Sin embargo, durante la vigencia original de la declara-ción de “emergencia energética” y basándose específica-mente en la necesidad de continuar la construcción acele-rada de proyectos como Vía Verde, la Legislatura enmendó *968 la Ley Núm. 76-2000 para permitir que el Gobernador ex-tienda el estado de emergencia, mediante orden ejecutiva, por el tiempo que permanezca en su cargo como primer ejecutivo.(130) También proveyó para que los trámites de las obras que comiencen durante la vigencia de la declaración de emergencia continúen hasta el final, según el procedi-miento acelerado, aunque el período dispuesto en la orden ejecutiva haya concluido.(131)
Las declaraciones de emergencia, no obstante, pueden pasar por un cedazo adicional, que es el del Poder Judicial. Para esto, la Ley Núm. 76-2000 permite que las personas afectadas adversamente por las resoluciones emitidas por las agencias en el marco de la emergencia soliciten revisión judicial ante el Tribunal de Apelaciones.(132) Esto se debe a que, al redactar el proyecto, se reconoció que era necesario proveer a los ciudadanos las garantías mínimas que exige la L.P.A.U., así como asegurar la fiscalización de los pro-yectos y la protección del ambiente y prevenir que la Ley Núm. 76-2000 implicara la inobservancia de los deberes ministeriales de las agencias.(133) Esta disposición cobra aun más valor ante la enmienda a la Ley Núm. 76-2000 que deja en manos del Poder Ejecutivo la extensión de la *969 emergencia y establece prácticamente la renuncia de la Rama Legislativa a fiscalizarlo.
Los tribunales tienen que ser sumamente cuidadosos al evaluar las solicitudes de revisión de decisiones adminis-trativas tramitadas de forma expedita de acuerdo con la Ley Núm. 76-2000. Son decisiones que se permiten excep-cionalmente y que, por su urgencia, no brindan el espacio para la participación ciudadana que se espera de los pro-cedimientos administrativos. Lo acelerado del proceso en esos casos hace que sea más probable la posibilidad de que se afecte adversamente a una o más personas. Esa reali-dad debe mover a los tribunales a atender con prontitud a la vez que con sumo rigor las alegaciones de los ciudadanos sobre los efectos adversos de las determinaciones administrativas. Por lo mismo, se debe interpretar cual-quier requisito de legitimación activa de la manera más favorable a los reclamantes.
Esto es de particular importancia cuando los ciudada-nos alegan que la orden ejecutiva que permitió acortar el trámite administrativo se dictó sin existir una verdadera emergencia, pues el historial de la Ley Núm. 76-2000 de-muestra que tanto los representantes de la Rama Legisla-tiva como los de la Rama Ejecutiva pretendieron en todo momento limitar las facultades que concede la ley para que no se diera ese uso inapropiado.
En este caso se ha cuestionado que la Orden Ejecutiva 2010-034 declare una emergencia real, pues se basa en un problema con el costo del combustible más que en una si-tuación de riesgo y plantea una política pública sobre el desarrollo de la infraestructura de generación energética más adecuada, en lugar de establecer una solución inme-diata a un problema grave de deterioro de la infraestruc-tura para proveer el servicio eléctrico. Los recurridos indi-can que el Gasoducto no representa una respuesta ante una emergencia, pues realmente es parte de un diseño ope-rativo de gran magnitud que se llevaría a cabo en varias *970 etapas.(134) Tampoco representa una opción de energía re-novable, que es lo que la orden ejecutiva define como la solución para enfrentar la “situación de emergencia” que ha creado “la dependencia excesiva de combustibles deri-vados del petróleo para generar electricidad” que “atenta contra la vida, la salud y la seguridad de todos los puertorriqueños”.(135) Alegan que el gas natural, además de no ser una fuente de energía renovable, ha provocado nu-merosos accidentes en los que cientos de personas han muerto, han resultado heridas o enfermas y han perdido sus bienes, por lo que la construcción y operación del ga-soducto, descritas en la DIA-F de Vía Verde, tiene un efecto opuesto al que busca la orden ejecutiva.(136)
Por otro lado, resulta casi imprescindible la revisión judicial en casos de declaraciones de impacto ambiental tra-mitadas de forma acelerada según la Ley Núm. 76 porque estos documentos son instrumentos de planificación que funcionan como “la primera etapa de un largo camino de autorizaciones oficiales”.(137) Sin embargo, ese camino se acorta cuando el proyecto se desarrolla amparado en una disposición legal que permite preterir los procesos de per- *971 misos y endosos. Entonces, cobra mayor vigencia el interés de un ciudadano por asegurarse de que el documento am-biental aprobado en poco tiempo contenga toda la informa-ción necesaria para que se evite que el desarrollo del pro-yecto le afecte adversamente.
IV
La decisión de hoy es parte de una tendencia reciente de este Tribunal que, en contravención de toda la doctrina sobre legitimación activa en casos de alto interés público que se ha estado desarrollando en las últimas décadas, crea requisitos que tienen el efecto de obstaculizar el ca-mino de la ciudadanía hacia los tribunales.(138) En nuestra disidencia en Surfrider advertimos que la Opinión mayori-taria estaba desarticulando nuestro desarrollo jurispru-dencial sobre la legitimación para llevar acciones públicas a nombre propio o de terceros.(139) Al disentir en Surfrider, rechazamos por excesivo el grado de especificidad que exi-gió la opinión mayoritaria para la alegación de daños. En ese caso, el ciudadano a quien el Tribunal no le reconoció legitimación cumplía no solo con el criterio de ser vecino del lugar impactado, sino también con los de haber parti-cipado de los procesos ante las agencias y tener un interés particular en el asunto por su efecto perjudicial para él.(140) Lo mismo sucede en este caso. Sin embargo, la Opinión mayoritaria decide, nuevamente, ignorar nuestra doctrina de legitimación.
Como punto de partida, debemos recordar que los requi-sitos de justiciabilidad en Puerto Rico no son impuestos constitucionalmente, sino adoptados jurisprudencial-mente. *972 (141) De los criterios de justiciabilidad, el requisito de legitimación activa es el que se exige con menor riguro-sidad.(142) Este se ha interpretado de forma cada vez más flexible, pues hemos reconocido que ello es necesario “para cumplir con nuestra responsabilidad constitucional” y no cerrar las puertas de los tribunales “a personas y entida-des que han sido adversamente afectadas y que presentan reclamaciones que pueden ser debidamente atendidas por el foro judicial”.(143)
La legitimación se examina aún más liberalmente cuando la demanda es contra las agencias y los funciona-rios gubernamentales.(144) Esta vertiente de la doctrina puertorriqueña sobre la legitimación activa, relacionada con las “acciones públicas”, flexibiliza la interpretación so-bre la capacidad de demandar de un ciudadano o grupo de ciudadanos cuando el reclamo está revestido de un alto interés público. Para ello, se analiza de forma liberal la ley en la que se fundamenta la acción, se amplía el concepto de lo que constituye un daño o se imponen menos exigencias en cuanto al requisito de que el daño sea particular del reclamante. Este detalle la distingue del modelo más res-trictivo de legitimación que se ha desarrollado en la juris-prudencia constitucional de Estados Unidos.(145) El profe-sor José Julián Alvarez señala que, a pesar de que el *973 Tribunal Supremo de Puerto Rico ha demostrado “más apego del necesario hacia la jurisprudencia del Tribunal Supremo federal” sobre justiciabilidad, cuando entra en el campo de la legitimación activa, “varias decisiones correc-tamente se apartan del modelo diseñado para las cortes federales y reconocen ‘acciones públicas’, sin exigir al liti-gante que demuestre un daño particularizado, distinto al del resto de la ciudadanía”.(146) Esto es posible ya que “la Constitución federal marca tan sólo el límite mínimo de los derechos que pueden reconocerse en Puerto Rico; cuánto más podemos volar es función de nuestras propias alas”.(147)
Pero en Fund. Surfrider y otros v. A.R.Pe. se cortan esas alas. En esa opinión, en la que hoy se ampara una mayoría de este Tribunal para cerrar las puertas de la justicia a los ciudadanos nuevamente, se incorporó a nuestra normativa cierta jurisprudencia federal sobre legitimación, sin hacer distinción alguna en cuanto a “acciones públicas”, solo por-que al redactarse la L.P.A.U. se tomaron como modelos la Administrative Procedure Act federal (A.P.A.) y el Model State Administrative Procedure Act (M.S.A.P.A.).(148) Al Tribunal no le importó que esas normas federales se usaron tan solo como guías y que la L.P.A.U. no es una copia de éstas, sino una ley independiente que incorpora la doctrina jurídica de Puerto Rico, con sus requisitos de legitimación activa más liberales.(149) De esa manera, Surfrider limitó *974 las posibilidades de que las personas afectadas por accio-nes administrativas solicitaran revisión judicial. El efecto de Surfrider ha sido restringir la legitimación en Puerto Rico, incluso más allá de lo resuelto por los tribunales federales.
El uso de jurisprudencia federal más restrictiva para estos fines es más preocupante aun cuando el caso plantea un problema ambiental, pues la protección del medio am-biente en Puerto Rico es una obligación impuesta constitucionalmente. La Constitución declara: “[s]erá polí-tica pública del Estado Libre Asociado la más eficaz con-servación de sus recursos naturales, así como el mayor de-sarrollo y aprovechamiento de los mismos para el beneficio general de la comunidad”.(150) Esta disposición no es una mera exhortación, sino que dicta el “criterio jurídico primordial para juzgar la validez o interpretar el significado de cualquier norma o decisión relativa al uso o protección de los recursos naturales formulada por la Asamblea Le-gislativa o por cualquier agencia, departamento, municipio o instrumentalidad gubernamental”, y prevalece sobre cualquier estatuto, reglamento u ordenanza en con-trario.(151)
Asimismo, para darle cuerpo a nuestra disposición cons-titucional, la Ley sobre Política Pública Ambiental ordena a todos los departamentos, agencias y corporaciones del Gobierno de Puerto Rico interpretar, aplicar y administrar todas las leyes y los reglamentos vigentes, así como los que se aprueben en el futuro, en “estricta conformidad” con los *975 objetivos de la política pública ambiental del Estado.(152) Nuestra política ambiental no es, pues, un adorno, un pro-cedimiento pro forma o una exigencia con la cual se cumple fácilmente con plasmar en papel lo que parezca plausible aunque no coincida con la realidad. Nuestra Constitución requiere una política de desarrollo que integre la conserva-ción y el uso responsable de los recursos, ya que las políti-cas ambientales no son obstáculos al progreso, sino garan-tías de calidad de vida para el futuro. (153)
Nuestra Ley sobre Política Pública Ambiental se distin-gue de la que aparenta ser su equivalente en el ámbito federal, la National Environmental Policy Act (N.E.P.A.).(154) En primer lugar, la N.E.P.A., contrario a la ley puertorriqueña, no tiene base constitucional. (155) En se-gundo lugar, distinto a nuestra Ley sobre Política Pública Ambiental, la N.E.P.A. no contiene una disposición que permita que “cualquier persona” recurra a los tribunales para exigir que se cumpla con su mandato.(156) Por eso, los *976 ciudadanos en Estados Unidos se amparan en la revisión judicial que provee la A.P.A. para presentar casos sobre incumplimiento con la N.E.P.A.(157)
Cuando se utiliza el mecanismo de revisión de la A.P.A. para hacer valer leyes que no conceden legitimación por sí mismas, no se deben analizar los requisitos de legitimación de manera uniforme y rigurosa, sino según las disposicio-nes sustantivas del estatuto en el que se basa la petición.(158) Esto se debe a que la A.P.A. establece que po-drá pedir revisión judicial de la acción de una agencia una persona adversamente afectada por ésta, dentro del signi-ficado de un estatuto pertinente.(159) El tratadista estado-unidense en materia de derecho administrativo Richard Pierce afirma que “una interpretación amplia del daño, la causalidad y la zona de interés es compatible con la inten-ción legislativa y la intención legislativa debe ser la base para resolver prácticamente todas las disputas sobre legi-timación a las que aplique la A.P.A.”.(160)
En este caso, aunque se entendiera que la legitimación para la revisión judicial de la L.P.A.U. se debe interpretar igual que la de la A.P.A., se tendrían que adecuar los re-quisitos de standing al contenido sustantivo de la Ley so-bre Política Pública Ambiental, que es el estatuto en el que *977 los recurridos fundamentan su impugnación a la aproba-ción de la DIA-F, es decir, “el estatuto pertinente”. Así, ha-bría que considerar que esa ley provee un marco de legiti-mación amplio para vindicar en los tribunales las violaciones a esta: acciones en daños contra entes privados, solicitudes de mandamus para obligar a las agencias a im-plantar la ley y acciones de revisión judicial para cuestio-nar decisiones referentes a documentos ambientales.(161)
De acuerdo con esas disposiciones sobre legitimación, este Tribunal ha afirmado que la Ley sobre Política Pública Ambiental establece “acciones públicas” que permiten a cualquier ciudadano afectado recurrir a los tribunales para obligar a la agencia proponente a ajustar sus acciones a las políticas ambientales y exigir al Estado el cumplimiento riguroso de su deber de velar por el uso prudente de los recursos.(162) Esa ley, además, impone utilizar todos los me-dios prácticos para que el País pueda “cumplir con las res-ponsabilidades de cada generación como custodio del me-dio ambiente para beneficio de las generaciones subsiguientes” y “lograr un balance entre la población y el uso de los recursos que permita altos niveles de vida y una *978 amplia participación de las amenidades de la vida”.(163) Con ese cimiento, las exigencias de legitimación activa tendrían que estudiarse obligatoriamente de la manera más favorable a las personas que acudan a los tribunales para pedir un uso juicioso de los recursos e impedir la degradación ambiental y los riesgos a la salud o la seguridad de los ciudadanos. Solo así el País, a través de la Rama Judicial, cumpliría con su deber de fomentar que la ciudadanía del presente vele por la calidad del ambiente para el bienestar de las generaciones por venir.
Más aún, debido a la legitimación estatutaria que pro-vee la política pública ambiental local y a su fundamento constitucional, así como al desarrollo de nuestro ordena-miento a favor de las “acciones públicas”, a un litigante en Puerto Rico no se le puede exigir probar su legitimación con el grado de rigurosidad exigido en un tribunal federal.(164) Además, en los últimos años, la propia jurispru-dencia federal sobre legitimación en casos ambientales se ha apartado del enfoque más restrictivo de la época de Lujan v. Defenders of Wildlife para reconocer capacidad para demandar a ciudadanos que cuestionan determinaciones que les afectan de la misma forma que a otras personas.
*979 Así, en Friends of Earth, Inc. v. Laidlaw Enviromental Services (TOC), Inc. el Tribunal Supremo de Estados Uni-dos decidió que unos ciudadanos representados por una or-ganización ambientalista tenían legitimación activa, por-que las descargas de aguas usadas hacia un río en exceso de las permitidas provocaban que una planta de incinera-ción de desperdicios afectara sus intereses recreativos, es-téticos y económicos.(165) Entre los daños que señalaron los ciudadanos se encontraban que: (1) vivían cerca del río y les interesaba ir a pescar, a contemplarlo y a bañarse en él, pero ya no se atrevían a hacerlo por la información de que estaba contaminado; (2) les gustaba comer, pasear y obser-var pájaros cerca del río, pero ya no lo hacían debido a la contaminación ambiental del área; (3) tenían intención de comprar una casa cerca del río, pero habían desistido por temor a los efectos de las descargas, y (4) el valor de sus propiedades se había reducido a causa de los problemas ambientales provocados por la planta.(166) En este caso, el Tribunal Supremo federal analizó las alegaciones a la luz de la doctrina de legitimación activa constitucional federal y la disposición sobre revisión judicial de la Clean Water Act, que le permite demandar a “personas que tienen un interés que está siendo o puede ser adversamente afectado”. (Enfasis y traducción nuestros.)(167)
Más recientemente, en Massachusetts v. E.P.A., el Tribunal Supremo federal le reconoció legitimación activa a *980 unas organizaciones ambientalistas y varios gobiernos es-tatales que reclamaron en los tribunales que la agencia de protección ambiental federal violó su deber de velar por que se cumpliera con la Clean Air Act al determinar que no regularía las emisiones de bióxido de carbono de vehículos de motor que contribuyen al calentamiento global y al cam-bio climático.(168) Los daños que alegaron y que el Tribunal determinó que eran suficientemente concretos incluyeron: (1) que la emisión de gases de invernadero contamina el aire y produce un alza en las temperaturas, (2) que el cam-bio climático que propician las emisiones provoca que au-mente el nivel del mar y se reduzcan los terrenos costeros, y (3) que el cambio climático tendrá efectos adversos serios sobre los ecosistemas naturales y la salud humana, los cuales, aunque remotos, son reales y podrían reducirse me-diante la acción que se solicitaba por parte de la agencia administrativa. Sus alegaciones se basaron en sucesos his-tóricos y en estudios científicos, igual que las de los recu-rridos en este caso cuando expresaron su preocupación res-pecto a su seguridad, tomando en cuenta las explosiones de gasoductos en varias ciudades y las fórmulas para deter-minar las zonas de riesgo.
Como se puede apreciar, los peticionarios a los que se les reconoció legitimación en estos casos, utilizando la doc-trina de standing federal en la cual se basa hoy la decisión de una mayoría de este Tribunal, no alegaban el tipo de daño inmediato y particularizado que se les está exigiendo a los vecinos del área donde se construye el gasoducto Vía Verde. Y es que el nivel de especificidad que requiere Surf-rider para la descripción de los daños y el uso mismo de la doctrina de legitimación activa han sido altamente critica- *981 dos en Estados Unidos cuando se trata de casos ambientales.(169) En los casos ambientales, la inminencia del daño no siempre va a estar presente, porque las conse-cuencias de un daño ambiental suelen ser acumulativas y progresivas.(170) Asimismo, en casos ambientales, el daño no puede ser particular, pues las actividades peijudiciales al medio ambiente afectan a todos los ciudadanos por igual.(171)
Por otra parte, el rango constitucional de nuestra polí-tica pública ambiental requiere que, cuando se trata de la revisión judicial de casos ambientales, se use una metodo-logía distinta a la que se utiliza en acciones administrati-vas en general. En cuanto a esto, el profesor Luis Rodrí- *982 guez Rivera explica que “[n]o podemos continuar evaluando problemas ambientales bajo un esquema de de-recho administrativo. Contrario a los Estados Unidos, nuestro ordenamiento ambiental es de génesis constitucio-nal y no estatutario. Como tal, nuestro medioambiente amerita una protección más celosa por parte de la Rama Judicial”.(172) Bajo esta óptica, la revisión judicial debe ser menos deferencial y el reconocimiento de legitimación ac-tiva de quienes buscan hacer valer una política ambiental debe ser más liberal y no atada a conceptos derivados de la L.P.A.U. No obstante, si se ignorase ese mandato constitu-cional y se decidiera atender los casos ambientales como cualquier otra acción administrativa, la interpretación so-bre legitimación activa adoptada en Fund. Surfrider y otros v. A.R.Pe. no es cónsona con nuestro ordena-miento.
Al examinar el significado de un estatuto, no es correcto tomar una frase aislada, identificar su presencia en las leyes de otras jurisdicciones y basarnos en ese dato para incorporar a nuestro ordenamiento la jurisprudencia inter-pretativa de esas leyes. Debemos tomar en cuenta que “[e]l medio más eficaz y universal para descubrir el verdadero sentido de una ley cuando sus expresiones son dudosas es considerar la razón y espíritu de ella o la causa o motivos que indujeron al poder legislativo a dictarla”.(173) El signi-ficado de la frase “adversamente afectada” que menciona la L.P.A.U. en su Sección 4.2 no debe explorarse en abstrac-ción de las demás disposiciones de la ley y su historial legislativo. Es necesario considerar las otras normas sobre revisión judicial que contiene la L.P.A.U.
La Sección 4.3 de la L.P.A.U. releva a los peticionarios del requisito de agotar todos los remedios administrativos *983 antes de solicitar revisión judicial en diversas circunstan-cias, con el fin de proteger sus derechos y evitar que muera su causa de acción.(174) La Sección 4.4 instruye al Tribunal Supremo a regular los procedimientos de revisión judicial de modo que se promueva el acceso efectivo a los tribunales para los ciudadanos.(175) La Sección 4.5 indica que el tribunal podrá conceder el remedio apropiado si determina que el recurrente tiene derecho a éste.(176) Originalmente, esa cláusula decía que los concedería si determinaba que el peticionario “ha sido o será sustancialmente perjudicado”, un estándar más estricto que el de “adversamente afecta-do”, y esa frase se sustituyó por “tiene derecho a un remedio”.(177) La Sección 4.6 establece que el tribunal puede conceder cualquier remedio que considere apro-piado, aunque el peticionario no lo haya solicitado.(178) Asi-mismo, la Sección 1.2, en la cual se declara la política pú-blica sobre los procedimientos administrativos, indica que la L.P.A.U. se interpretará liberalmente.(179) El informe de la Legislatura en el que se recomienda la aprobación del proyecto de ley que se convirtió en la L.P.A.U. recalca que el texto intenta al máximo “mantener fidelidad al principio rector de flexibilidad que debe permear el Derecho Administrativo”.(180) Todas esas cláusulas apuntan hacia la apertura de los tribunales para las personas que interesen revisar determinaciones administrativas.
Según explicamos en nuestra disidencia en Fund. Surfrider y otros v. A.R.Pe., no hay razón para obviar la *984 legitimación estatutaria que establece la L.P.A.U. y recu-rrir a la doctrina federal sobre el standing. La L.P.A.U. dispone que "una parte adversamente afectada por una or-den o resolución final de una agencia ... podrá presentar una solicitud de revisión ante el Tribunal de Apela-ciones”.(181) Cuando a una parte se le confiere capacidad para demandar por vía legislativa, no es necesario analizar la legitimación según los requisitos de justiciabilidad.(182) Pero, aunque se entendiera que la L.P.A.U. no le concede tal legitimación estatutaria, la determinación de los crite-rios para decidir quién puede solicitar revisión de acciones administrativas en los tribunales no debe ignorar la natu-raleza flexible e inclusiva de nuestro ordenamiento administrativo.
La revisión judicial representa la continuación de un proceso administrativo, caracterizado por una mayor flexi-bilidad en pro de la participación ciudadana.(183) El trámite administrativo de evaluación de una DIA ni siquiera es un procedimiento adjudicativo.(184) Siendo así, no tiene por qué *985 compartir los requisitos de legitimación para demandar que se imponen comúnmente en los casos que se presentan ante los tribunales.(185) No obstante, aunque entendamos que, en la etapa de revisión judicial, es necesario cumplir con los criterios de legitimación desarrollados para los tribunales, la interpretación del término “adversamente afec-tada” que adopta Surfrider carece de apoyo en la jurispru-dencia sobre legitimación, tanto en la puertorriqueña y como en la federal.(186)
El presente caso reafirma el análisis incorrecto de Fund. Surfrider y otros v. A.R.Pe. A pesar de que nuestra L.P.A.U. provee legitimación estatutariamente, se recurrió a la doctrina de legitimación activa constitucional para analizar la capacidad de acudir en revisión judicial. No solo eso, sino que, en lugar de utilizar los criterios de legi-timación activa de Puerto Rico, se usaron los criterios más rigurosos desarrollados para las cortes federales. Al ha-cerlo, además, no se consideraron los precedentes más re-cientes del Tribunal Supremo de Estados Unidos que flexi-bilizan el reconocimiento de legitimación activa en *986 “acciones públicas” por asuntos ambientales. Finalmente, se aplicaron esas normas sin tener en cuenta que este caso surge bajo el palio de la Ley sobre Política Pública Ambien-tal, que tiene base constitucional. Por todo eso, entende-mos que el análisis de legitimación activa que hace la opi-nión mayoritaria en este caso se asienta en premisas erróneas.
V
En el fondo de esta controversia legal yace un problema de acceso a la justicia(187) El acceso a la justicia “es el principal derecho —el más importante de los derechos huma-nos— en un sistema legal moderno e igualitario que tenga por objeto garantizar, y no simplemente proclamar, los de-rechos de todos” y requiere un sistema judicial que garan-tice su ejercicio pleno.(188) En términos más concretos y en palabras del profesor Efrén Rivera Ramos, “[p]or acceso a la justicia nombramos el conjunto de condiciones que faci-litan o dificultan el que determinados grupos, sectores o personas puedan hacer uso equitativo de los mecanismos y procesos establecidos para la prevención de la violación de los derechos, para la solución de controversias y para la obtención de remedios legales”. (189) Los obstáculos para ac-ceder a la justicia no responden solo al diseño de las estruc-turas judiciales y administrativas y a los recursos disponi-bles, sino también a la forma como se organiza la sociedad *987 en general, y particularmente a una falta de sensibilidad respecto a los problemas de los demás.(190)
Los estudios sobre el acceso a la justicia destacan el derecho a la revisión judicial de decisiones administrativas como un componente esencial, pues “la ausencia de meca-nismos judiciales adecuados para efectuar una revisión amplia de las decisiones administrativas también tiene efectos directos sobre la vigencia de los derechos sociales”. (191) Otra razón para abogar por una concepción amplia sobre la legitimación en revisiones de decisiones administrativas es que, de esa manera, se permite que la ciudadanía se asegure del funcionamiento adecuado de las agencias gubernamentales y se cumplen metas importan-tes relacionadas con la política pública del país.(192)
Los obstáculos para que los ciudadanos y las ciudada-nas puedan presentar sus reclamos se han observado du-rante todo el proceso de evaluación del proyecto de ga-soducto Vía Verde. Desde la declaración de “emergencia energética”, que trastoca todos los procedimientos diseña-dos para garantizar la participación ciudadana, hasta la decisión de hoy sobre una supuesta carencia de legitima-ción activa, el camino sólo se ha ido empinando.(193)
La Opinión mayoritaria, en su recuento de los hechos, indica que la A.E.E. fue quien pidió a la J.C.A. que exten-diera el término para hacer comentarios sobre la DIA-P de *988 5 días a 30 días y que celebrara vistas públicas.(194) La J.C.A. accedió a esto debido a “la complejidad de la acción propuesta [y] lo voluminoso del borrador de documento ambiental presentado”.(195) Asimismo, la opinión menciona la celebración de vistas públicas —en las cuales se discutió el borrador de documento ambiental y no la DIA-P— y los informes sobre la DIA-P que se presentaron, indicando las fechas de los sucesos. Sin embargo, excluye los datos si-guientes: que la DIA-F se presentó el 29 de noviembre de 2010 y el Subcomité evaluó el documento en tan sólo un día; que las recomendaciones que presentó el Subcomité el 30 de noviembre simplemente se enviaron a la A.E.E.; que la J.C.A. realizó “un análisis ponderado de la totalidad del contenido e integridad del expediente administrativo de la agencia” así como un estudio de la DIA-F que le permitió concluir que ésta cumplió con todos los requisitos de la Ley sobre Política Pública Ambiental y consideró adecuada-mente los impactos ambientales que conlleva Vía Verde, a tan sólo un día de haberse presentado el documento, el 30 de noviembre de 2010. La opinión tampoco informa que los ciudadanos solicitaron vistas públicas sobre la DIA-P el 24 de noviembre y fueron denegadas en la misma resolución que aprobó la DIA-F.(196)
Si los vecinos pexjudicados no intervienen ahora porque es prematuro para que tengan legitimación, cuando inten-ten intervenir en etapas más adelantadas del proyecto, ¿les señalarán que no mostraron interés anteriormente, cuando podían haber expresado sus reparos a la DIA-F? El contenido de ese documento que hoy no se les está permi-tiendo impugnar ¿será utilizado como evidencia de que el proyecto cumple con los requisitos de protección ambiental cuando se opongan al gasoducto Vía Verde en una etapa *989 más avanzada de su construcción o cuando esté listo para comenzar a operar? Entonces, ¿les dirán a los vecinos que no se opusieron lo suficiente anteriormente; que los fondos públicos que ya se han invertido en el proyecto tienen más peso que sus preocupaciones; que “ya es académico el debate en el foro judicial en cuanto a la sabiduría o error en la decisión tomada”?(197) ¿En qué momento podrán interve-nir estos vecinos para expresar su posición sobre un pro-yecto que les afecta directamente?
La limitación que una mayoría de este Tribunal les im-pone a las personas que solicitan revisión judicial en este caso destruye toda una trayectoria de liberalización de los criterios adoptados por este mismo Tribunal para decidir qué casos deben examinarse en los foros judiciales. Esto representa un grave retroceso para nuestra vida democrática. Después de todo, la llamada liberalización de los requisitos de legitimación activa solo busca garantizar una oportunidad real de participación a personas con inte-rés legítimo en una controversia. (198) No es un asunto de compasión hacia la parte más débil o de simpatía con los planteamientos de un grupo. (199) Se trata de que un tribunal de justicia no puede escudarse en interpretaciones ma-leables del Derecho ni en el mito de la imparcialidad para aplacar los reclamos ciudadanos.
Hacer constar que se está ignorando nuestra doctrina sobre legitimación activa y que, en la alternativa, los recu-rridos lograron cumplir con los criterios restrictivos adop-tados en Fund. Surfrider y otros v. A.R.Pe. no es más que el ejercicio de nuestro deber constitucional como miembros de este Tribunal. Recurrir a etiquetas de activismo judicial para desacreditar esa labor y considerar el análisis propio una demostración de “la mayor objetividad” es engañarse *990 uno mismo.(200) Un sector de este Tribunal entiende que no le corresponde revisar cierto tipo de casos. A eso, y no a frías aplicaciones de conceptos técnicos, es que responden sus decisiones. Para alcanzar ese fin, utiliza una deferen-cia extrema a la función administrativa y la interpretación más restrictiva posible del derecho a cuestionar las decisio-nes administrativas en los tribunales. Y, claro, sobre nues-tras respectivas filosofías de adjudicación podemos discrepar. Pero caracterizar de forma negativa a quien piensa diferente no tiene el resultado pretendido de debili-tar sus argumentos. En este caso, tampoco encubre la con-secuencia de la determinación mayoritaria.(201)
El cierre al público de las instituciones públicas tiene el único efecto de acrecentar la pérdida de confianza en los organismos gubernamentales por parte de la ciudada-nía.(202) La confianza de los ciudadanos es esencial para el funcionamiento y la efectividad de los tribunales, porque el respeto que la gente le tenga a las instituciones judiciales es lo que le brinda a éstas fuerza y autoridad. (203) Reitera-mos que “[l]os derechos constitucionales realmente *991 existen cuando hay el acceso a la justicia; no por el mero hecho de que se hayan plasmado en la constitución de un país, sino porque a través de los tribunales se asegura al ciudadano el poder vindicarlos”. (204)
Al declarar que las personas adversamente afectadas que están impugnando la DIA-F del proyecto de gasoducto Vía Verde no tienen legitimación para acceder a nuestros tribunales, se le resta legitimidad a nuestro sistema de justicia como guardián de los derechos de nuestros ciuda-danos y ciudadanas. Si los organismos de justicia diseña-dos para presentar reclamos y resolver desacuerdos no es-tán disponibles, ¿a dónde podrán recurrir estaspersonas?

 Autoridad de Energía Eléctrica (A.E.E.), Declaración de Impacto Ambiental Final para el Proyecto Vía Verde de Puerto Rico, págs. 1-7 a 1-8 (DIA-F de Vía Verde), disponible en http://www.aeepr.com/viaverde-DIAP2.asp (última visita, 3 de enero de 2012). Ni la A.E.E. ni la Junta de Calidad Ambiental (J.C.A.) incluyeron la DIA-F en sus peticiones de certiorari, las cuales se atienden de manera consolidada en este caso.

 íd„ pág. 1-8.

 Fund. Surfrider y otros v. A.R.Pe., 178 D.P.R. 563 (2010).

 Ley Núm. 76-2000 (3 L.P.R.A. sec. 1931 et seq.).

 Justo Lozada y otros v. A.E.E. y J.C.A., KLRA 2010 1238, consolidado con KLRA 2010 1246 y KLRA 2010 1248, Resolución del Tribunal de Apelaciones de 18 de agosto de 2011, págs. 3 y 4; Apéndice del certiorari CC-2011-718, págs. 2-3; Apén-dice del certiorari CC-2011-722, págs. 860-861. Esta es la resolución que está en revisión ante el Tribunal Supremo y se refiere al caso KLRA 2010 1246.

 Véase Opinión mayoritaria, págs. 921-924.

 íd., pág. 919.

 Véanse, por ejemplo: Fund. Surfrider v. A.R.Pe., supra, pág. 573; García Oyola v. J.C.A., 142 D.P.R. 532, 539 (1997); Salas Soler v. Srio. de Agricultura, 102 D.P.R. 716, 723 (1974).

 Véase Voto de conformidad del Juez Martínez Torres en Brito Díaz et al. v. Bioculture et al., 183 D.P.R. 720 (2011). En éste se indica que la norma de que la presencia de un peticionario con legitimación activa es suficiente para que se pueda acoger el recurso, aunque los demás peticionarios no tengan legitimación, es conse-cuente con Su/frider, y se concluye que un vecino del proyecto propuesto que perdió compradores potenciales para las propiedades que estaba desarrollando estableció un daño suficientemente concreto para poder presentar una solicitud de paralización de una obra de construcción cuyos permisos se están impugnando. Véase, también, *931 Rumsfeld, v. Forum for Academic and Institutional Rights, Inc., 547 U.S. 47, 52 esc. 2 (2006).

 Misión Ind. P.R. v. J.P. y A.A.A., 142 D.P.R. 656, 682 (1997).

 Colón y otros v. J.C.A., 148 D.P.R. 434, 452 (1999).

 (Énfasis en el original.) Mun. de San Juan v. J.C.A., 152 D.P.R. 673, 711 (2000).

 Misión Ind. P.R. v. J.C.A., 145 D.P.R. 908, 924-925 (1998).

 P.C.M.E. v. J.C.A., 166 D.P.R. 599, 611-613 (2005).

 Misión Ind. P.R. v. J.C.A., supra, págs. 923-924.

 Escrito de Revisión Administrativa ante el TA presentado por Juan Cortés y otros en In re Autoridad de Energía Eléctrica, KLRA 2010 246, 21 de diciembre de 2010 [Escrito de Revisión], págs. 37-38; Apéndice del certiorari CC-2011-718, págs. 59-60; Apéndice del certiorari CC-2011-722, págs. 87-88.

 Los vecinos señalan que el Informe ni siquiera incluye los comentarios pre-sentados por los peritos del Colegio de Ingenieros y del Fish and Wildlife Service. Escrito de Revisión, págs. 39-40; Apéndice del certiorari CC-2011-718, págs. 61-62; Apéndice del certiorari CC-2011-722, págs. 89-90. Véase, además, la Regla 26.6 del Reglamento Núm. 3672 sobre Procedimiento de Vistas Administrativas de la Junta de Calidad Ambiental de 1988, que la J.C.A. ordenó utilizar en la celebración de las vistas sobre el borrador de documento ambiental de Vía Verde y que obliga al panel examinador a incluir los comentarios recibidos en su informe. R-10-30-1 de la J.C.A., pág. 3; Apéndice del certiorari CC-2011-722, pág. 15. R-10-37-1 de la J.C.A., pág. 6; *933 Apéndiee del certiorari CC-2011-718, pág. 122s 5; Apéndice del certiorari CC-2011-722, pág. 422.

 R-10-30-1 de la J.C.A., pág. 2; Apéndice del certiorari CC-2011-722, pág. 14. El portavoz que suscribió la solicitud de vistas públicas fue el recurrido Miguel Báez Soto. R-10-45-1 de la J.C.A., págs. 2-3 y 7; Apéndice del certiorari CC-2011-722, págs. 34-35 y 39.

 Escrito de Revisión, págs. 42-43; Apéndice del certiorari CC-2011-718, págs. 64-65; Apéndice del certiorari CC-2011-722, págs. 92-93. Según se observa en la tabla de resumen de comentarios en las vistas públicas y respuestas a éstos, incluida al final del Cap. 8 de la DIA-F, muchas de las preocupaciones de los vecinos y de las organizaciones profesionales que presentaron ponencias se contestaron refiriéndolos a secciones de la DIA que están impugnando, señalando que la J.C.A. tiene el expertise para hacer la evaluación que hizo o con la oración: “No tenemos comentarios.” En la tabla también se observa que no aparecen los comentarios que el escrito de revi-sión menciona que fueron ignorados y que los representantes de Eco Eléctrica infor-maron que no tendrían la capacidad necesaria para la operación de Vía Verde.

 (Enfasis suplido.) R-10-45-1 de la J.C.A., pág. 4; Apéndice del certiorari CC-2011-722, pág. 36.

 (Escolio omitido.) Hernández, Álvarez v. Centro Unido, 168 D.P.R. 592, 639 (2006).

 Regla 252 del Reglamento de la J.C.A. para el Proceso de Presentación, Evaluación y Trámite de Documentos Ambientales, Reglamento Núm. 6510 del De-partamento de Estado, 22 de agosto de 2002 (Reglamento 6510 de 2002). Este era el reglamento vigente cuando se aprobó la Resolución que se impugna e incluye, entre otras, las primeras tres situaciones mencionadas. Este fue sustituido por el Regla-mento de Evaluación y Trámite de Documentos Ambientales de la J.C.A., Regla-mento Núm. 7948 del Departamento de Estado, 30 de noviembre de 2010 (Reglamen-to 7948 de 2010), que entró en vigor el 1 de diciembre de 2010 y que enmendó el Reglamento 6510 para acoplarlo a las disposiciones de la nueva Ley de Permisos, Ley Núm. 161-2009. La Regla 112 B del Reglamento 7948 de 2010 incluye, entre otras, las cinco situaciones mencionadas.

 Regla 203 (Definiciones) del Reglamento 6510 de 2002, pág. 9. La definición de “impacto ambiental significativo” en la Regla 109 EE del Reglamento 7948 es idéntica a la del Reglamento 6510.

 Escrito de Revisión, págs. 5-6; Apéndice del certiorari CC-2011-718, págs. 28-29; Apéndice del certiorari CC-2011-722, págs. 55-56.

 En la lista de deponentes a los que la J.C.A. les envía copia de la R-10-45-1, aparece en el número 21, en la página 10 de la Resolución; Apéndice del certiorari CC-2011-718, pág. 122c 9; Apéndice del certiorari CC-2011-722, pág. 42.

 La Servidumbre Escénica y de Conservación Clark Foreman, en Adjuntas, es la primera de este tipo en Puerto Rico y fue establecida en 1971 a través de un convenio entre el Fideicomiso de Conservación de Puerto Rico y los esposos Clark y Mairi Foreman. El predio está protegido a perpetuidad mediante una escritura con cláusulas restrictivas que permite a los dueños mantener la titularidad de los terre-nos con la condición de que los usos que hagan de éstos no alteren las características naturales del paisaje, del bosque húmedo que domina el área y del Río Portugués. El área se utiliza para estudios científicos y educativos. Esta servidumbre forma parte del escaso 7.2% de los terrenos de Puerto Rico que están protegidos por ley para fines de conservación. Fideicomiso de Conservación de Puerto Rico, Áreas naturales pro-tegidas — Servidumbre Escénica del Río Portugués (Familia Foreman), en www.fideicomiso.org (última visita: 1 de enero de 2012).

 Escrito de Revisión, págs. 6-7; Apéndice del certiorari CC-2011-718, págs. 29-30; Apéndice del certiorari CC-2011-722, págs. 56-57. El Lago Dos Bocas, creado por la A.E.E. para la generación de energía hidroeléctrica, sirve agua para el pro-yecto Superacueducto de la Autoridad de Acueductos y Alcantarillados.

 Paoli Méndez v. Rodríguez, 138 D.P.R. 449,456-471 (1995). Véase, por ejem-plo, la Ley de Arena, Grava y Piedra, que otorga una protección especial a los ríos que se utilizan para toma de agua al requerir que, antes de otorgar cualquier per-miso de excavación, extracción o dragado en estas cuencas hidrográficas, el Depar-tamento de Recursos Naturales se asegure del cumplimiento con la Ley sobre Polí-tica Pública Ambiental mediante la preparación de una DIA en lugar de la evaluación ambiental menos rigurosa que se requiere para otros terrenos. 28 L.P.R.A. sec. 207.

 Misión Ind. P.R. v. J.P. y A.A.A., supra. Véase también M. Padilla Rodrí-guez, El derecho humano al agua en Puerto Rico: desde el Derecho Internacional hasta su protección local, 68 (Núm. 4) Rev. Col. Abog. P.R. 778 (2007).

 2 de la Ley para la Conservación, el Desarrollo y el Uso de los Recursos de Agua de Puerto Rico, Ley Núm. 136 de 3 de junio de 1976 (12 L.P.R.A. sec. 1115a). Esta ley permite el aprovechamiento de los pozos y las tomas de agua. 12 L.P.R.A. secs. 1115n-1115p y 1115u.

 Escrito de revisión, pág. 5; Apéndice del certiorari CC-2011-718, pág. 28; Apéndice del certiorari CC-2011-722, pág. 55.

 íd.

 gn ja j¡sta deponentes a los que la J.C.A. les envía copia de la R-10-45-1, aparece en el número 23, en la página 10 de esa Resolución; Apéndice del certiorari CC-2011-718, pág. 122c 9; Apéndice del certiorari CC-2011-722, pág. 42.

 Escrito de Revisión, pág. 8; Apéndice del certiorari CC-2011-718, pág. 31; Apéndice del certiorari CC-2011-722, pág. 58. Otros residentes del Barrio Arenas que figuran como recurridos son Virginio Heredia Bonilla, certiorari Serrano Maldonado y Yamil Heredia Serrano, en representación propia y de su hijo menor de edad Jean Paul Heredia Romero. Escrito de revisión, pág. 9; Apéndice del certiorari CC-2011-718, pág. 32; Apéndice del certiorari CC-2011-722, pág. 59.

 DIA-F de Vía Verde, págs. 6-12 a 6-17.

e) Escrito de Revisión, pág. 11; Apéndice del certiorari CC-2011-718, pág. 34; Apéndice del certiorari CC-2011-722, pág. 61.

 En la lista de deponentes a los que la J.C.A. les envía copia de la R-10-45-1, aparece en el número 22, en la página 10 de la Resolución; Apéndice del certiorari CC-2011-718, pág. 122c 9; Apéndice del certiorari CC-2011-722, pág. 42.

 Escrito de Revisión, págs. 78-83; Apéndice del certiorari CC-2011-718, págs. 100-105; Apéndice del certiorari CC-2011-722, págs. 128-133. Véanse: Nueva Ley de Vida Silvestre de Puerto Rico, Ley Núm. 241-1999 (12 L.P.R.A. secs. 107-107u); Ley de Humedales en Puerto Rico, Ley Núm. 314-1998 (12 L.P.R.A. sees. 5001-5005); Colón Cortés v. Pesquera, 150 D.P.R. 724, 783 (2000).

 Escrito de Revisión, págs. 83-86; Apéndice del certiorari CC-2011-718, págs. 105-108; Apéndice del certiorari CC-2011-722, págs. 133-136. Véase Ley para la Protección y Conservación de la Fisiografía Cárstica de Puerto Rico, Ley Núm. 292-1999 (12 L.P.R.A. sees. 1151-1158).

 Escrito de Revisión, págs. 86-89; Apéndice del certiorari CC-2011-718, págs. 108-111; Apéndice del certiorari CC-2011-722, págs. 136-139. Véanse: Regla 253A del Reglamento 6510 de 2002; Regla 112E del Reglamento 7948 de 2010.

 Escrito de revisión, págs. 89-94; Apéndice del certiorari CC-2011-718, págs. 111-116; Apéndice del certiorari CC-2011-722, págs. 139-144. Véase Ley para la Protección del Patrimonio Arqueológico Terrestre de Puerto Rico, Ley Núm. 112 de 20 de julio de 1988 (18 L.P.R.A. sees. 1551-1566).

 Art. 4(b)(5) de la Ley sobre Política Pública Ambiental, Ley Núm. 416-2004 (12 L.P.R.A. sec. 8001a(b)(5)); Comisión de Recursos Naturales y Calidad Ambiental de la Cámara de Representantes, Informe sobre el P. de la C. 4790, 24 de junio de 2004, pág. 4; J.C.A., Informe de Evaluación del P. de la C. 4790 (Historial Legislativo de la Ley 416-2004), 18 de junio de 2004, págs. 4-5. El principio de prevención o Precautionary Principle se tomó de la Declaración de Río sobre Ambiente y Desarro-llo de 1992, que adoptó la Conferencia sobre Ambiente y Desarrollo de la Organiza-ción de Naciones Unidas para guiar el desarrollo sustentable.

 Arts. 4(b)(5)(B), (C) y (D) de la Ley Núm. 416-2004 (12 L.P.R.A. sec. 8001a(b)(5)).

 Escrito de Revisión, págs. 59-69; Apéndice del certiorari CC-2011-718, págs. 81-91; Apéndice del certiorari CC-2011-722, págs. 109-119. Es de conocimiento pú-blico que, por instrucciones del gobernador Luis Fortuño, la A.E.E. está evaluando nuevamente si son viables estas alternativas, en especial la de las barcazas. Además, Vía Verde está siendo revaluado actualmente por un comité nombrado por el gobernador. Véanse: G.E. Alvarado León, “El gasoducto tiene los días contados”, en: Puerto Rico Hoy: Asuntos energéticos, El Nuevo Día, 12 de enero de 2012, pág. 12; G.E. Alvarado León, “Fortuño debe hablar claro”, en: Puerto Rico Hoy: Alternativas energéticas, El Nuevo Día, 13 de enero de 2012, pág. 29; G. Ruiz Kuilan, “Sobre la mesa el futuro del gasoducto”, en: Puerto Rico Hoy, El Nuevo Día, 14 de enero de 2012, pág. 36; G. Ruiz Kuilan, “El gasoducto del norte: relato de un natimuerto”, en: A Fondo, El Nuevo Día, págs. 36-37; G.E. Alvarado León, “Otra tranquilla para el gasoducto”, en: Puerto Rico Hoy: Proyecto energético, El Nuevo Día, 8 de febrero de 2012, pág. 10; D. Rivera Vargas y G.E. Alvarado León, “Contundente pedido ciuda-dano”, en: Puerto Rico Hoy: Protesta contra el gasoducto, El Nuevo Día, 20 de febrero de 2012, pág. 6; G.E. Alvarado León, “Fortuño vuelve a apoyar el gasoducto”, en: Puerto Rico Hoy: Energía, El Nuevo Día, 20 de febrero de 2012, pág. 8.

 Escrito de Revisión, pág. 5; Apéndice del certiorari CC-2011-718, pág. 28; Apéndice del certiorari CC-2011-722, pág. 55. En su Alegato ante este Tribunal, los vecinos también indican que “[l]as acciones de las partes peticionarias han menos-cabado la paz y el libre disfrute de la propiedad de los comparecientes, toda vez que les han causado grandes angustias mentales al realizar los procedimientos de expro-piación de forma irresponsable. Las cartas notificando a los aquí recurridos sobre la intención de expropiación de sus terrenos causan grandes angustias mentales, ya *942 que muchos de estos tienen sus predios completamente sembrados y dependen de sus cosechas para el sustento de sus familias. Además, la agricultura es el empleo al cual se han dedicado toda su vida. Una expropiación los obligaría a buscar una nueva forma de sustento, lo que les causa una grave angustia, pues altera su estilo de vida, al cual han estado acostumbrados por años”. Alegato de las Partes Recurridas ante el TS, CC-2011-718 y CC-2011-722, 26 de septiembre de 2011, pág. 18 (Alegato de las partes recurridas).

 Escrito de Revisión, pág. 7; Apéndice del certiorari CC-2011-718, pág. 30; Apéndice del certiorari CC-2011-722, pág. 57.

 Escrito de Revisión, págs. 10-11; Apéndice del certiorari CC-2011-718, págs. 33-34; Apéndice del certiorari CC-2011-722, págs. 60-61.

 Rivera v. S.L.G. Díaz, 165 D.P.R. 408, 424-427 (2005). En este caso también reconocimos los daños ambientales morales, que son los que sufre una persona cuando la acción de otra peijudiea, por ejemplo, un paisaje con valor ecológico que disfrutaba el reclamante en su propiedad. Ambos tipos de daños ambientales son resarcibles.

 Escrito de Revisión, pág. 10; Apéndice del certiorari CC-2011-718, pág. 33; Apéndice del certiorari CC-2011-722, pág. 60. Véase; también, Oposición a Alegato de las Partes Recurridas de la A.E.E. en el T.S., 6 de octubre de 2011, pág. 9 (Oposición a alegato).

 Escrito de revisión, págs. 7-8; Apéndice del certiorari CC-2011-718, págs. 30-31; Apéndice del certiorari CC-2011-722, págs. 57-58. Véase también Oposición a alegato, pág. 9.

 En la lista de deponentes a los que la J.C.A. les envía copia de la R-10-45-1, aparece en el número 4, en la página 10 de la Resolución; Apéndice del certiorari CC-2011-718, pág. 122c 9; Apéndice del certiorari CC-2011-722, pág. 42.

 Escrito de revisión, pág. 7; Apéndice del certiorari CC-2011-718, pág. 30; Apéndice del certiorari CC-2011-722, pág. 57.

 Alegato de las partes recurridas, CC-2011-718 y CC-2011-722, págs. 20-21. El caso ante el Tribunal de Primera Instancia es el KEF 2010 428. La petición de entrada a propiedad fue incluida en la petición de certiorari de la J.C.A. Apéndice del certiorari CC-2011-718, págs. 752-756.

 Certiorari de la J.C.A. ante el T.S., CC-2011-718, pág. 17; certiorari de la A.E.E. ante el T.S., CC-2011-722, 6 de septiembre de 2011, págs. 24-25.

 En diciembre de 2011, el Tribunal de Primera Instancia, en el caso A.E.E. v. Montero, KEF 2011 431, paralizó la entrega material de las propiedades para las cuales ya comenzó el proceso de expropiación hasta tanto el proyecto Vía Verde obtenga los permisos de construcción del Cuerpo de Ingenieros del Ejército de Esta-dos Unidos, porque los terrenos aún no se podrán dedicar al uso público propuesto.

 véanse, por ejemplo: Sagardía de Jesús v. Hosp. Aux. Mutuo, 177 D.P.R. 484, 506 (2009); Cintrón Adorno v. Gómez, 147 D.P.R. 576, 589 (1999); García Pagán v. Shiley Caribbean, etc, 122 D.P.R. 193, 205-206 (1988); Acosta & Rodas, Inc. v. PRAICO, 112 D.P.R. 583, 611-612 (1982); Ramos Rivera v. E.L.A., 90 D.P.R. 828, 831 (1964).

 Escrito de revisión, pág. 11; Apéndice del certiorari CC-2011-718, pág. 34; Apéndice del certiorari CC-2011-722, pág. 61.

 En la lista de deponentes a los que la J.C.A. les envía copia de la R-10-45-1, aparece en el número 58, en la página 11 de la Resolución; Apéndice del certiorari CC-2011-718, pág. 122c 10; Apéndice del certiorari CC-2011-722, pág. 43.

 Escrito de revisión, pág. 11; Apéndice del certiorari CC-2011-718, pág. 34; Apéndice del certiorari CC-2011-722, pág. 61.

 Escrito de revisión, pág. 6; Apéndice del certiorari CC-2011-718, pág. 29; Apéndice del certiorari CC-2011-722, pág. 56. Ante este Tribunal, los vecinos expli-can que “el proceso de entrega de cartas, contratos y visitas inesperadas a las pro-piedades para medir las fincas que están realizando los empleados contratados por la A.E.E. ha causado gran inquietud e inseguridad a los aquí comparecientes. Esto se debe a que la falta de información sobre los procedimientos y acciones que está tomando el gobierno crea incertidumbre sobre el destino de sus propiedades, vidas y fuentes de sustento. Además, los recurridos se han sentido oprimidos y amenazados con las constantes visitas, a las cuales se suma el sobrevuelo de helicópteros de la A.E.E. Estos helicópteros vuelan a una altura sumamente cerca del suelo de sus propiedades, lo que ha causado daño a sus cosechas y a su tranquilidad mental y emocional debido, entre otras razones, al ruido extremo que producen los helicópteros”. Alegato de las partes recurridas, CC-2011-718 y CC-2011-722, pág. 18.

 Escrito de revisión, pág. 6; Apéndice del certiorari CC-2011-718, pág. 29; Apéndice del certiorari CC-2011-722, pág. 56.

 íd.

 íd.

 Asoc. Vec. H. San Jorge v. U. Med. Corp., 150 D.P.R. 70, 77-78 (2000).

 Véase M.F. Moretón Sanz, La intimidad personal y familiar a la luz de la jurisprudencia del Tribunal Europeo de Derechos Humanos: el caso español y la protección contra las inmisiones derivadas de la contaminación acústica, 41 Rev. Jur. U.I.P.R. 299 (2006).

 Art. II, Sec. 8, Const. P.R., L.P.R.A., Tomo 1; Vigoreaux Lorenzana v. Quizno’s, 173 D.P.R. 254, 261-262 (2008); Arroyo v. Rattan Specialties, Inc., 117 D.P.R. 35, 56-64 (1986); P.R. Tel. Co. v. Martínez, 114 D.P.R. 328, 338-340 (1983); Colón v. Romero Barceló, 112 D.P.R. 573, 576 (1982).

 Pueblo v. Figueroa Navarro, 104 D.P.R. 721, 725 (1976). Véase, también, E.L.A. v. Hermandad de Empleados, 104 D.P.R. 436, 439-441 (1975).

 Surfrider, supra, págs. 587-588.

 Escrito de revisión, pág. 10; Apéndice del certiorari CC-2011-718, pág. 33; Apéndice del certiorari CC-2011-722, pág. 60.

 íd.

 Escrito de revisión, pág. 9; Apéndice del certiorari CC-2011-718, pág. 32; Apéndice del certiorari CC-2011-722, pág. 59.

 Escrito de revisión, pág. 10; Apéndice del certiorari CC-2011-718, pág. 33; Apéndice del certiorari CC-2011-722, pág. 60.

 Id. El procedimiento de expropiación sobre la propiedad de Cándida Cruz Cruz y Amparo Cruz Cruz comenzó mientras se tramitaba este caso. Oposición a alegato, pág. 9. Otros vecinos del Barrio Factor 2 que están impugnando la DIA-F son Pablo Montalvo Bello y Ramona Ramos Días. Escrito de revisión, pág. 9; Apén-dice del certiorari CC-2011-718, pág. 32; Apéndice del certiorari CC-2011-722, pág. 59.

 Escrito de revisión, págs. 8-9; Apéndice del certiorari CC-2011-718, págs. 31-32; Apéndice del certiorari CC-2011-722, págs. 58-59.

 Escrito de revisión, págs. 10-11; Apéndice del certiorari CC-2011-718, págs. 33-34; Apéndice del certiorari CC-2011-722, págs. 60-61.

 Escrito de revisión, pág. 9; Apéndice del certiorari CC-2011-718, pág. 32; Apéndice del certiorari CC-2011-722, pág. 59.

 Escrito de revisión, págs. 7-8; Apéndice del certiorari CC-2011-718, págs. 30 — 31; Apéndice del certiorari CC-2011-722, págs. 57-58.

 En la lista de deponentes a los que la J.C.A. les envía copia de la R-10-45-1, aparece en el número 8, página 10 de dicha Resolución; Apéndice del certiorari CC-2011-718, pág. 122c 9; Apéndice del certiorari CC-2011-722, pág. 42.

 Escrito de revisión, pág. 7; Apéndice del certiorari CC-2011-718, pág. 30; Apéndice del certiorari CC-2011-722, pág. 57. En la página 9 de su Oposición al alegato de las partes recurridas, presentado el 6 de octubre de 2011, la A.E.E. in-formó que la señora Rodríguez Torres, ya es parte del grupo de ciudadanos contra quienes comenzó el proceso de expropiación.

 Escrito de revisión, pág. 8; Apéndice del certiorari CC-2011-718, pág. 31; Apéndice del certiorari CC-2011-722, pág. 58.

 Escrito de revisión, pág. 9; Apéndice del certiorari CC-2011-718, pág. 32; Apéndice del certiorari CC-2011-722, pág. 59. El procedimiento de expropiación sobre la propiedad de Raquel Ortiz González comenzó mientras se tramitaba este caso. Oposición a alegato, pág. 9.

 Escrito de revisión, pág. 94; Apéndice del certiorari CC-2011-718, pág. 116; Apéndice del certiorari CC-2011-722, pág. 144.

 Certiorari de la A.E.E. en el TS, CC-2011-722, pág. 22. La DIA-F menciona que en la zona de alta peligrosidad de 150 pies “no se permitirá la construcción de nuevas estructuras”. DIA-F de Vía Verde, pág. 5-55.

 Escrito de revisión, págs. 48-49; Apéndice del certiorari CC-2011-718, págs. 70-71; Apéndice del certiorari CC-2011-722, págs. 98-99. DIA-F de Vía Verde, págs. 5-55 a 5-56.

 Escrito de revisión, págs. 49-51; Apéndice del certiorari CC-2011-718, págs. 71-73; Apéndice del certiorari CC-2011-722, págs. 99-101. Véase, también, N. García Martínez, Comentarios sobre el Gasoducto del Sur-Centro-Norte, 16 de octubre de 2010; Apéndice del certiorari CC-2011-718, págs. 122q-122q 24; Apéndice del certio-rari CC-2011-722, págs. 339-363. En el Cap. 5 de la DIA-F, se estima que el gas natural entrará a la tubería con una presión de 650 libras por pulgada cuadrada, pero todos los equipos tienen capacidad para operar a una presión de 1,450 libras por pulgada cuadrada. DIA-F de Vía Verde, págs. 5-3 y 5-51.

 Escrito de Revisión, págs. 51-52; Apéndice del certiorari CC-2011-718, págs. 73-74; Apéndice del certiorari CC-2011-722, págs. 101-102.

 Escrito de revisión, págs. 52-57; Apéndice del certiorari CC-2011-718, págs. 74-79; Apéndice del certiorari CC-2011-722, págs. 102-107.

 Lo mismo hicieron los peticionarios en Massachusetts v. E.P.A., infra.

 Escrito de revisión, págs. 7 y 11; Apéndice del certiorari CC-2011-718, págs. 30 y 34; Apéndice del certiorari CC-2011-722, págs. 57 y 61.

 Fund. Surfrider y otros v. A.R.Pe., supra, pág. 588. Véase Opinión mayori-taria, pág. 923.

 Escrito de revisión, págs. 69-75; Apéndice del certiorari CC-2011-718, págs. 91-97; Apéndice del certiorari CC-2011-722, págs. 119-125. Véase también R-10-37-1 de la J.C.A., págs. 20-22; Apéndice del certiorari CC-2011-718, págs. 122s 19 - 112s 21; Apéndice del certiorari CC-2011-722, págs. 436-438.

 Escrito de revisión, págs. 75-78; Apéndice del certiorari CC-2011-718, págs. 97-100; Apéndice del certiorari CC-2011-722, págs. 125-128. Véase Mun. de Loíza v. Sucns. Suárez et al., 154 D.P.R. 333, 361 (2001).

 Escrito de revisión, págs. 43-48 y 58-59; Apéndice del certiorari CC-2011-718, págs. 65-70 y 80-81; Apéndice del certiorari CC-2011-722, págs. 93-98 y 108-109.

 Escrito de revisión, págs. 45 y 48; Apéndice del certiorari CC-2011-718, págs. 67 y 70; Apéndice del certiorari CC-2011-722, págs. 95 y 98. Véase también Oneida Delgado — Area de Asesoramiento Científico J.C.A., Evaluación DIA-P (Borrador) (AEE) Vía Verde de Puerto Rico, 17 de agosto de 2010, págs. 12-13; Apéndice del certiorari CC-2011-718, págs. 122h ll-122h 12; Apéndice del certiorari CC-2011-722, págs. 248-249.

 Opinión mayoritaria, pág. 920.

 Escrito de Revisión, págs. 41-99; Apéndice del certiorari CC-2011-718, págs. 63-121; Apéndice del certiorari CC-2011-722, págs. 91-149.

 Véanse: Crespo v. Cintrón, 159 D.P.R. 290, 299 (2003); Col. Peritos Elec. v. A.E.E., 150 D.P.R. 327, 332 (2000); Col. Ópticos de P.R. v. Vani Visual Center, 124 D.P.R. 559, 567 (1989). Esta práctica es cónsona con la política de nuestros tribuna-les de permitir a los ciudadanos su “día en corte” y promover que los casos se resuel-van en sus méritos. Véanse, por ejemplo, Pueblo v. Rivera Toro, 173 D.P.R. 137, 145 (2008); Soc. de Gananciales v. García Robles, 142 D.P.R. 241, 260 (1997).

 Alegato de las partes recurridas, CC-2011-718 y CC-2011-722, págs. 12-13.

 Certiorari de la J.C.A. ante el T.S., CC-2011-718, págs. 13-15.

 Opinión mayoritaria, págs. 919-920. Una situación similar se da cuando se pretende evaluar por separado un permiso de construcción del uso que se le va a dar a esa construcción, pues todas las etapas de desarrollo de un proyecto están indiscu-tiblemente vinculadas. Véase, por ejemplo, Voto de conformidad del Juez Martínez Torres en Brito Díaz et al. v. Bioculture et al., 183 D.P.R. 720, 726 (2011), en el que señala: “No podemos separar los conceptos construcción y uso. La ley no concibe que se conceda un permiso de construcción enajenado del uso que se le va a proporcionar a la edificación construida. Después de todo, nadie construye en el abstracto.” (Én-fasis suprimido.)

 “[E]l proceso de presentación, análisis y trámite de los documentos ambien-tales dispuesto en este reglamento [de la J.C.A. sobre declaraciones de impacto ambiental] debe concluirse previo al inicio del proyecto o acción gubernamental pro-puesta” y “previo a establecer cualquier compromiso de naturaleza irrevocable de los recursos o del ambiente”. Regla 251 B del Reglamento 6510 de 2002, pág. 34; Regla 112 C del Reglamento 7948 de 2010.

 Véase Alegato de las partes recurridas, CC-2011-718 y CC-2011-722, pág. 23.

 Misión Ind. P.R. v. J.C.A., supra, págs. 926-927.

 Id., págs. 925-926. Véase Opinión mayoritaria, págs. 919-920.

 Misión Industrial P.R. v. J.P. y A.A.A., supra, pág. 685.

 Nuestra norma de legitimación activa es sumamente amplia cuando se trata de casos de interés público como el presente. AMPR v. Srio. Educación, E.L.A., 178 D.P.R. 253, 265 (2010). En éstos, “el pueblo es considerado como la parte espe-cialmente interesada y el demandante no necesita probar que tiene interés especial en el resultado del caso. Basta demostrar que es un ciudadano y como tal está inte-resado en la ejecución y protección del derecho público”. Asociación de Maestros v. Pérez, Gobernador Int., 67 D.P.R. 848, 851 (1947). Véanse, también: AMPR v. Srio. Educación, E.L.A., supra, págs. 265-266; Pacheco Fraticelli v. Cintrón Antonsanti, 122 D.P.R. 229, 237 (1988); Solís v. Municipio de Caguas, 120 D.P.R. 53, 56 (1987); P.S.P. v. E.L.A., 107 D.P.R. 590, 595 (1978).

 Lo planteado en el escrito de revisión es suficiente para determinar que existen los daños requeridos, sin contar con el resto de la información presentada por los recurridos, que se encuentra en el expediente administrativo de la J.C.A., que no se elevó a este Tribunal. Aun así, los recurridos, en el Tribunal de Apelaciones, ofrecieron suplementar su escrito de revisión con declaraciones juradas sobre sus daños. Alegato de las partes recurridas, CC-2011-718 y CC-2011-722, págs. 25-26. En Sierra Club v. Morton, 405 U.S. 727, 735 esc. 8 (1972), se permitió que los opo-sitores al proyecto propuesto enmendaran sus alegaciones para establecer que sufri-rían un daño particular. Este caso es citado extensamente en la discusión sobre “parte adversamente afectada” de Fund. Surfrider y otros v. A.R.Pe., supra, págs. 583-584.

 Hernández Torres v. Hernández Colón et al., 131 D.P.R. 593, 598 (1992); E.L.A. v. P.R. Tel. Co., 114 D.P.R. 394, 399 (1983).

 Noriega v. Hernández Colón, 135 D.P.R. 406, 420-421 (1994). Véanse, tam-bién: Moreno v. Pres. U.P.R. II, 178 D.P.R. 969, 973 (2010); E.L.A. v. Aguayo, 80 D.P.R. 552, 558-559 (1958).

 Crespo v. Cintrón, supra, pág. 299; Hernández Agosto v. Romero Barceló, 112 D.P.R. 407, 413 (1982).

 Alegato de las partes recurridas, CC-2011-718 y CC-2011-722, pág. 23.

 Debemos mencionar que, según se desprende de los alegatos de las partes y las resoluciones administrativas y judiciales, la participación de los recurridos ha sido mayor que la reflejada en el expediente, pues, en algunas ocasiones no se inclu-yeron los comentarios que manifestaron o entregaron a las agencias en los informes que éstas prepararon y en otras ocasiones los tribunales decidieron no aceptar los documentos presentados por los vecinos.

 Véase San Antonio Maritime v. P.R. Cement Co., 153 D.P.R. 374, 392-393 (2001).

 García Oyola v. J.C.A., supra, págs. 538-539. En este caso, un grupo de vecinos solicitó la revisión de la determinación de la J.C.A. de aprobar una DIA para un proyecto de la A.E.E. mediante el cual se establecería una planta para generar electricidad cerca de sus residencias.

 (Énfasis suplido.) Hernández Torres v. Gobernador, 129 D.P.R. 824, 835 (1992).

 Lozada Tirado et al. v. Testigos Jehová, 177 D.P.R. 893 (2010).

 Asoc. Maestros P.R. v. Srio. Educación, 137 D.P.R. 528, 535-536 (1994); Col. Ópticos de P.R. v. Vani Visual Center, supra, pág. 567.

 Yéase Opinión mayoritaria, pág. 922.

 Véanse Asoc. Maestros P.R. v. Secretario Educación, supra, págs. 542-543; Col. Ópticos de P.R. v. Vani Visual Center, supra, pág. 568.

 Misión Ind. P.R. v. J.C.A., supra, pág. 930. Véase también la opinión de conformidad del Juez Hernández Denton en Mun. de San Juan v. J.C.A., supra, págs. 745-752.

 Exposición de Motivos de la Ley Núm. 76-2000 (2000 (Parte 1) Leyes de Puerto Rico 652).

 Arts. 2-13 de la Ley Núm. 76-2000, 3 L.P.R.A. seos. 1932-1943.

 Los documentos del Historial Legislativo de la Ley Núm. 76 de 2000, supra, están disponibles a través del sistema electrónico de la Oficina de Servicios Legisla-tivos, bajo el P. del S. 1791 de 1999, www.oslpr.org.

 Véanse: A.E.E., Comentarios al P. del S. 1791, 14 de octubre de 1999; A.E.E., Comentarios al P. del S. 1791, 14 de junio de 1999; J.C.A., Cometarios al P. del S. Í791, 8 de junio de 1999; J.C.A., Cometarios al P. del S. 1791, 15 de octubre de 1999; Administración de Reglamentos y Permisos (A.R.Pe.), Comentarios al P. del S. 1791, 7 de octubre de 1999, pág. 2; Departamento de Recursos Naturales y Ambien-tales, Comentarios al P. del S. 1791, págs. 2-4; Departamento de Justicia, Comenta-rios al P. del S. 1791, 22 de octubre de 1999, págs. 8-9.

 P. del S. 1791, 13 de mayo de 1999, 13ra Asamblea Legislativa, 6ta Sesión Ordinaria, pág. 4.

 (Énfasis suplido.) Art. 1(a) de la Ley Núm. 76-2000 (3 L.P.R.A. sec. 1931(a)); Informe de Conferencia sobre el P. del S. 1791, 22 de noviembre de 1999.

 P. del S. 1791, supra, pág. 8; Art. 12 de la Ley Núm. 76-2000, 3 L.P.R.A. see. 1942. En este caso, el término de la emergencia era originalmente del 19 de julio de 2010 al 19 de enero de 2011.

 Art. 2 de la Ley Núm. 76-2000 (3 L.P.R.A. sec. 1932).

 Los informes de las comisiones legislativas que atendieron el proyecto de ley resaltan que éste surgió para ser más efectivos en emergencias como la ocurrida por el paso del Huracán Georges y evitar suspensiones prácticamente totales de los servicios públicos esenciales. Comisión de Gobierno y Asuntos Federales del Senado, Informe del P. del S. 1791, junio de 1999, pág. 3; Comisión de Gobierno de la Cámara de Representantes, Informe sobre el P. del S. 1791, 5 de noviembre de 1999, págs. 1-2. Véase, además, W. Vázquez Irizarry, Los poderes del gobernador de Puerto Rico y el uso de órdenes ejecutivas, 76 Rev. Jur. U.P.R. 951, 1039-1040 (2007). El profesor explica que la Ley Núm. 76-2000, supra, para dispensar de los trámites de permisos debe verse en conjunto con el Art. 15 de la Ley Núm. 211-1999 (25 L.P.R.A. see. 172m) sobre manejo de emergencias y administración de desastres, que se utiliza para declarar estados de emergencia cuando fenómenos atmosféricos causan estragos.

 Exposición de Motivos y Arts. 1-2 de la Ley Núm. 32-2011. Esta ley fue aprobada el 14 de marzo de 2011 para regir inmediatamente. En la Exposición de Motivos, menciona que, aunque la política energética del Gobierno de Puerto Rico dirige los esfuerzos de infraestructura hacia la energía renovable, esos proyectos necesitan combinarse con la construcción de Vía Verde para reducir la dependencia del petróleo utilizando también el gas natural. Añade que “[e]sa iniciativa de nuestra Administración [Vía Verde] es parte de un plan comprensivo para atender con mayor celeridad la emergencia energética decretada por el Gobernador [OE-2010-034]” y que la enmienda a la Ley Núm. 76-2000 busca “asegurarnos que todas las solicitudes de permisos de aquellos proyectos energéticos iniciados durante la vigencia de la Orden Ejecutiva, y los que puedan surgir durante alguna extensión, puedan aprove-char el proceso expedito establecido”.

 Art. 12 de la Ley Núm. 76-2000, según enmendada por la Ley Núm. 32-2011 (3 L.P.R.A. sec. 1942).

 Art. 13 de la Ley Núm. 76-2000 (3 L.P.R.A. see. 1943).

 Comisión de Gobierno del Senado, supra, págs. 3-4 y 6.

 Sobre este punto, la A.E.E. señala en su recurso ante este foro que el proyecto de gasoducto Vía Verde es “parte del plan estratégico de la A.E.E. para reducir la dependencia del petróleo para generar energía eléctrica en Puerto Rico” y es “un paso de transición hacia el futuro para permitir el desarrollo de proyectos de energía renovable”. Certiorari de la A.E.E. ante el TS, CC-2011-722, pág. 3.

 véase la Orden Ejecutiva 2010-034 de 19 de julio de 2010; Apéndice del certiorari CC-2011-718, págs. 1034-1036; Apéndice del certiorari CC-2011-722, págs. 1-3. Durante la evaluación del proyecto Vía Verde, el Área de Asesoramiento Cien-tífico de la J.C.A. indicó que la A.E.E. no proveyó información sobre otros proyectos de energía renovable ni justificó su exclusión como alternativas. Aseveró que: “Aun-que el gas natural es un combustible menos contaminante que el petróleo y sus derivados, la intención de mejorar la diversificación se convierte en la sustitución del petróleo por el gas natural, pero ambos son combustibles fósiles. ¿Cómo se podría, entonces, comenzar la transición hacia esos futuros proyectos de fuentes de energía renovable con el proyecto Vía Verde?” Oneida Delgado — Área de Asesoramiento Cien-tífico J.C.A., Evaluación DIA-P (Borrador) (AEE) Vía Verde de Puerto Rico, 17 de agosto de 2010, pág. 2; Apéndice del certiorari CC-2011-718, pág. 122h 1; Apéndice del certiorari CC-2011-722, pág. 238.

 Escrito de revisión, págs. 24-36; Apéndice del certiorari CC-2011-718, págs. 46-58; Ápéndice del certiorari CC-2011-722, págs. 74-86.

 Misión Ind. P.R. v. J.C.A., supra, pág. 925.

 Véanse: Fund. Surfrider y otros v. A.R.Pe., supra; JP, Plaza Santa Isabel v. Cordero Badillo, 177 D.P.R. 177 (2009). La extensión de Surfrider a la controversia de este caso consolida esa preocupante y lamentable tendencia.

 Fund. Surfrider y otros v. A.R.Pe., supra, pág. 612, opinión disidente de la Jueza Fiol Matta.

 íd., págs. 598-600.

 E.L.A. v. Aguayo, supra.

 Los tribunales ejercen su discreción “dependiendo de la trascendencia del derecho afectado y la importancia de los intereses en conflicto”. Zachry International v. Tribunal Superior, 104 D.P.R. 267, 273 (1975).

 Col. Ópticos de P.R. v. Vani Visual Center, supra, pág. 564.

 Asoc. de Maestros v. Srio. de Educación, 156 D.P.R. 754, 765 (2002); García Oyola v. E.L.A., supra, pág. 539. Esto se debe a que las cuestiones de gran interés público no pueden tratarse con las mismas normas que las contiendas privadas, pues las circunstancias dispares exigen tratamientos diferentes. E.L.A. v. P.R. Tel. Co, supra, pág. 399.

 L.M. Villaronga, Derecho Constitucional, 62 (Núm. 4) Rev. Jur. U.P.R. 683, 684-685 (1993). Véase, también, Hernández Torres v. Gobernador, supra, págs. 875-887, opinión disidente del Juez Rebollo López. Sobre la doctrina de legitimación activa en Puerto Rico, véase además, J.J. Alvarez González, Derecho Constitucional de Puerto Rico y relaciones constitucionales con los Estados Unidos, Bogotá, Ed. Temis, 2009, págs. 114-119.

 J.J. Álvarez González, La protección de los derechos humanos en Puerto Rico, 57 Rev. Jur. U.P.R. 133, 168-169 (1988).

 íd., pág. 168.

 Véanse: Ley de Procedimiento Administrativo Uniforme (L.P.A.U.), Ley Núm. 170 de 12 de agosto de 1988 (3 L.P.R.A. secs. 2101-2201); Pagán Ramos v. F.S.E., 129 D.P.R. 888, 898 (1992).

 Fund. Surfrider y otros v. A.R.Pe., supra, págs. 600-604, opinión disidente de la Jueza Fiol Matta. Véase J. Berkan, La nueva Ley de Procedimiento Adminis-trativo Uniforme de Puerto Rico: una comparación con Administrative Procedure Act, San Juan, Ed. Universidad Interamericana de Puerto Rico, 1989. Véase, también, la tabla comparativa entre la A.P.A., el M.S.A.PA. y la Ley Núm. 170 incluida en el historial legislativo de la L.P.A.U. Además, el historial de la L.P.A.U. revela que, desde 1968, se intentó aprobar una ley de procedimiento administrativo en el país. *974 Se descartaron los proyectos que eran traducciones literales del M.S.A.P.A. en varias ocasiones y el texto de la L.P.A.U. aprobado en 1988, que consideró la A.P.A. y el M.S.A.P.A. como antecedentes, fue el producto de una discusión intensa en la que participaron casi todas las agencias de Puerto Rico. Informe Conjunto de las Comi-siones de Gobierno Estatal, Asuntos Municipales y de lo Jurídico del Sustitutivo P. del S. 350.

 Art. VI, Sec. 19, Const. P.R., L.P.R.A., Tomo 1, ed. 2008, pág. 440.

 Misión Ind. P.R. v. J.C.A., supra, págs. 919-920. Véase, además, Fed. Pesc. Playa Picúas v. J.P., 148 D.P.R. 406, 412 (1999).

 Art. 4(b) de ia Ley Núm. 416-2004 (12 L.P.R.A. sec. 8001a(b)). La Ley sobre Política Pública Ambiental procura “(1) [l]a más efectiva protección del ambiente y los recursos naturales; (2) el uso más prudente y eficiente de los recursos naturales para beneficio de toda la ciudadanía; (3) un progreso social que reconozca las nece-sidades de todos, y el logro y mantenimiento de altos y estables niveles de creci-miento económico”. Art. 3 de la Ley Núm. 416-2004 (12 L.P.R.A. sec. 8001(c)).

 Misión Ind. P.R. v. J.P. y A.A.A., supra, pág. 689. Por eso, el escrutinio más riguroso de las determinaciones administrativas que pueden afectar nuestro am-biente es el estándar de revisión judicial más adecuado para nuestra realidad constitucional. Mun. de San Juan v. J.C.A., supra, págs. 749-752, opinión de confor-midad del Juez Hernández Denton. Véase, además, L. Fiol Matta, De regreso al futuro: el hard look y la “nueva" revisión judicial rigurosa en casos ambientales, 72 Rev. Jur. U.P.R. 71 (2003). Por la misma razón, la doctrina de legitimación activa más flexible es la más apropiada para estos casos. Véase E.L. Chiesa Aponte, Co-mentarios a la ponencia de la jueza Fiol Matta sobre el estándar de revisión judicial en casos ambientales, 72 Rev. Jur. U.P.R. 93, 107-108 (2003).

 jvbííoreai Environmental Policy Act (N.E.P.A.), 42 U.S.C.A. secs. 4321-4347.

 En su análisis de los casos ambientales resueltos por este Tribunal, el profesor Luis Rodríguez Rivera señala como desacertado el uso de interpretaciones de la N.E.P.A. para fundamentar la revisión judicial, ignorando nuestras realidades jurídicas, sociales y ambientales, y limitando el alcance de nuestro mandato consti-tucional de preservación del ambiente. L.E. Rodríguez Rivera, La educación jurídica y el derecho ambiental: la jurisprudencia como instrumento en la educación jurídi-ca — Análisis quinquenal de la jurisprudencia ambiental, 70 Rev. Jur. U.P.R. 1097 (2001).

 Véase Art. 19 de la Ley Núm. 416-2004, 12 L.P.R.A. sec. 8002m.

 Véase R. Beers, Standing and Rights of Action in Environmental Litigation, American Law Institute, 2007, págs. 40-41 y 52-55.

 VIA. Fletcher, The Structure of Standing, 98 Yale L.J. 221, 255-265 (1988). El profesor Fletcher señala que la A.RA. establece una “presunción de revisabilidad”. íd., pág. 265. Véase, también, la discusión sobre la “provisión generosa para revisión judicial” de la A.RA. y su relación con las “zonas de interés” de otras leyes, especial-mente las que confieren legitimación a “cualquier persona” o atienden preocupacio-nes legislativas amplias, como son las ambientales, en C.H. 4 Koch, Administrative Law and Practice 3rd 335-338 (2010).

 «a person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.” A.P.A., 5 U.S.C.A. sec. 702.

 «[A] broa(j interpretation of injury, causality, and the zone of interests test is consistent with congressional intent and congressional intent should be the basis for resolving virtually all standing disputes to which the APA applies.” R.J. Pierce, Administrative Law Treatise, 5ta ed., Austin, Aspen Publishers, 2010, Vol. Ill, pág. 1537.

 Art. 19 de la Ley Núm. 416-2004 (12 L.P.R.A. sec. 8002m). En específico, la Ley dispone que las impugnaciones de decisiones de la J.C.A. sobre documentos ambientales no se tramitan mediante un mandamus, sino utilizando el procedi-miento que provee la L.P.A.U. De esta forma, confiere legitimación para solicitar revisión judicial en el Tribunal de Apelaciones a “cualquier persona natural o jurí-dica afectada por la falta de implantación” de la Ley. Id.

 Colón Cortés v. Pesquera, supra. En este caso, varias comunidades objeta-ron las deficiencias de la declaración de impacto ambiental de un proyecto mediante el recurso de mandamus que establecía la Ley sobre Política Pública Ambiental de 1970. Esta se sustituyó por la Ley sobre Política Pública Ambiental de 2004 y ahora las impugnaciones de decisiones de la J.C.A. relacionadas con documentos ambien-tales se tramitan mediante recursos de revisión judicial de determinaciones admi-nistrativas, como el que se presentó en este caso. No obstante, el recurso sigue siendo una “acción pública” diseñada para que cualquier ciudadano afectado pueda exigir el cumplimiento con la política pública ambiental. De esa forma, se faculta “al ciuda-dano común, que es quien normalmente se ve afectado por los problemas ambienta-les, con una forma simple de solicitar la observancia seria y escrupulosa de la política pública ambiental”. Id., pág. 785. Véanse, también: Misión Ind. P.R. v. J.C.A., supra, pág. 927; Salas Soler, supra, págs. 718-725; Cerame-Vivas v. Srio. de Salud, 99 D.P.R. 45, 52 (1970).

 Art. 4(a)(1) y (5) de la Ley Núm. 416-2004 (12 L.P.R.A. sec. 8001a(a)(1) y (5)).

 Debemos recordar que la A.P.A., según fue redactada, reconoce legitimación a los ciudadanos en diversas circunstancias y no representa un impedimento, como tampoco lo representaba la doctrina de legitimación activa, para que el Congreso reconozca capacidad jurídica por vía legislativa en numerosos escenarios. Véase C.R. Sunstein, What’s Standing After Lujan? Of Citizen Suits, “Injuries”, and Article III, 91 Mich. L. Rev. 163, 181-182, 192-193 y 209-236 (1992). En cuanto a las “acciones públicas” o del ciudadano, el Tribunal Supremo de Estados Unidos resolvió, en Lujan v. Defenders of Wildlife, 504 U.S. 555 (1992), que la exigencia constitucional federal de “caso o controversia” no permite que el Congreso otorgue capacidad para solicitar un remedio judicial a cualquier ciudadano, sino que éste tiene que cumplir con los requisitos de la legitimación activa. Sin embargo, esta decisión se basó en la doctrina de separación de poderes federal, que no obliga a los tribunales de Puerto Rico ni controla las determinaciones de la Legislatura puertorriqueña. Entonces, “nuestro poder legislativo puede crear por sí mismo este tipo de remedio disponible para toda la ciudadanía” y con ello no estaría burlando los requisitos de justiciabilidad. W. Vázquez Irizarry, Derecho Administrativo, 79 (Núm. 2) Rev. Jur. U.P.R. 647, 658 (2010). Así lo hizo en las leyes ambientales vigentes.

 Friends of Earth, Inc. v. Laidlaw Enviromental Services (TOC), Inc., 528 U.S. 167, 180-189 (2000). Este caso es citado en Fund. Surfrider y otros v. A.R.Pe., supra, pág. 573. Véase, también, R.V. Percival & J.B. Goger, Escaping the Common Law’s Shadow: Standing in the Light of Laidlaw, 12 Duke Envtl. L. & Pol’y Forum 119, 141-154 (2001).

 Friends of Earth, Inc. v. Laidlaw Enviromental Services (TOC), Inc., supra, págs. 181-183.

 (Énfasis y traducción nuestros.) 33 U.S.C.A. sec. 1365. Véase también Friends of Earth, supra, págs. 173-175. Cuando se presentó la demanda, Laidlaw pidió que se desestimara porque los miembros de la organización ambientalista no habían demostrado un daño concreto o injuiy in fact para tener legitimación activa. A los demandantes se les permitió presentar declaraciones juradas sobre sus daños para suplementar sus alegaciones. Id., pág. 177.

 Massachusetts v. EPA, 549 U.S. 497, 516-526 (2007). Eneste caso se revocó la sentencia de la Corte de Apelaciones para el Distrito de Columbia en la que se denegó la petición de revisión judicial de la determinación administrativa. Véanse, además: R. J. Lazarus, Super Wicked Problems and Climate Change: Restraining the Present to Liberate the Future, 94 Cornell L. Rev. 1153 (2009); B.C. Mank, Standing and Future Generations: Does "Massachusetts u. EPA’’ Open Standing for Generations to Come?, 34 Colum. J. Envtl. L. 1 (2009).

 Véase, por ejemplo, P. Weinberg, Unbarring the Bar of Justice: Standing in Environmental Suits and the Constitution, 21 Pace Envtl. L. Rev. 27 (2003). En éste se advierte que limitar el acceso de los ciudadanos a los tribunales en casos ambien-tales, a través de la doctrina de legitimación activa, permite que el gobierno y las industrias violen impunemente las políticas ambientales, cuando, si se quiere prote-ger el esquema de separación de poderes como se invoca al recurrir a los requisitos de justiciabilidad, la Rama Judicial tiene que ser accesible y eficaz para evitar abu-sos por parte del Poder Ejecutivo. Por otro lado, los criterios trazados en la jurispru-dencia federal para determinar legitimación en casos que surgen por violaciones a la N.E.P.A. y otras leyes ambientales han creado gran confusión y han sido desaproba-dos por expertos que señalan que se desarrollaron obviando distinciones importantes entre los casos ambientales y otros en los que normalmente se analizan los daños sufridos. Véanse: B. Mank, Standing and Statistical Persons: A Risk-Based Approach to Standing, 36 Ecology L.Q. 665 (2009); R.J. Lazarus, Human Nature, the Laws of Nature, and the Nature of Environmental Law, 24 Va. Envtl. L.J. 231 (2005); G.R. Nichol, Standing for Privilege: The Failure of Injury Analysis, 82 B.U. L. Rev. 301 (2002).

 D.N. Cassuto, The Law of Words: Standing, Environment, and Other Contested Terms, 28 Harv. Envtl. L. Rev. 79, 86-87 y 127-128 (2004). El profesor Cassuto explica que las doctrinas de legitimación activa tradicionales no tienen cabida en la jurisprudencia ambiental, pues la noción de un daño particular relacionado con los bienes de una persona es incompatible con el ambiente, que es de todos y de nadie a la vez. Cassuto sugiere que los tribunales se fijen, entonces, en si el daño es del tipo que la legislación ambiental busca prevenir. Asimismo, critica que se requiera que el ciudadano haya sufrido un daño concreto si el estatuto habla de que el ciudadano vea adversamente afectado un interés suyo o entienda que se ha violado una política pública. Id., pág. 86. Véase el Art. 4 de la Ley sobre Política Pública Ambiental, en el que se reconoce “el carácter mundial y de largo alcance de los problemas ambientales”. 12 L.P.R.A. sec. 8001a(b)(6).

 Además, las leyes ambientales hablan de zonas de interés y algunas otor-gan capacidad para demandar, por lo que naturalmente van a chocar con el análisis de caso o controversia constitucional. S. Kalen, Standing on its Last Legs: Bennett v. Spear and the Past and Future of Standing in Environmental Cases, 13 J. Land Use & Envtl. L. 1 (1997).

 L.E. Rodríguez Rivera, No todo lo que brilla es oro: apuntes sobre el desa-rrollo de la norma de revisión judicial en la jurisprudencia ambiental a la luz de la constitucionalización de la política pública ambiental puertorriqueña, 72 Rev. Jur. U.P.R. 113, 133 (2003).

 Art. 19 del Código Civil, 31 L.P.R.A. sec. 19.

 See. 4.3 de la L.P.A.U., 3 L.P.R.A. sec. 2173.

 See. 4.4 de la L.P.A.U., 3 L.P.R.A. sec. 2174. También instruye a evitar desestimaciones por defectos de forma y a fomentar la comparecencia de ciudadanos por derecho propio y en forma pauperis.

 Sec. 4.5 de la L.P.A.U., 3 L.P.R.A. see. 2175.

 Véanse: Sustitutivo al P. del S. 350 de 9 de abril de 1987, pág. 24; Informe del Sustitutivo al P. del S. 350 de 3 de junio de 1988, pág. 22.

 Sec. 4.6 de la L.P.A.U., 3 L.P.R.A. sec. 2176.

 Sec. 1.2 de la L.P.A.U., 3 L.P.R.A. see. 2101. La A.PA. no contiene una disposición similar.

 Informe Conjunto, supra, pág. 11.

 See. 4.2 de la L.P.A.U., según enmendada por la Ley Núm. 277-2006 (3 L.P.R.A. see. 2172).

 Com. de la Mujer v. Srio. de Justicia, 109 D.P.R. 715, 723-724 (1980); Fletcher, supra, págs. 253-254. El profesor Richard Pierce afirma que: “Once Congress issues a command to agencies and calls on courts to enforce that command, a judicial refusal to enforce the command can no longer be characterized as judicial restraint. It is more accurately characterized as abdication of judicial responsibility to enforce the policy decision of a politically accountable Branch.” Pierce, op. cit., pág. 1439. Véase, también, la discusión de este autor sobre la relación del requisito de ser “adversamente afectado” con el standing estatutario y la evolución inconsistente de la jurisprudencia del Tribunal Supremo de Estados Unidos sobre el requisito de legitimación en casos de revisión judicial de decisiones administrativas. Id., págs. 1401-1544.

 por ejemplo, en este caso, los recurridos no tuvieron que presentar una solicitud de intervención ante la J.C.A. para participar del proceso administrativo.

 Xanto la peticionaria J.C.A. como los recurridos resaltaron que el procedi-miento en este caso no es adjudicativo. Certiorari de la J.C.A. ante el T.S. CC-2011-718, 6 de septiembre de 2011, págs. 17-18; Alegato de las partes recurridas, CC-2011-718 y CC-2011-722, págs. 13-15. Sin embargo, a pesar de que la elaboración de una DIA no es un procedimiento reglamentario ni adjudicativo y el proceso de revi-sión de la L.P.A.U. está diseñado para procedimientos adjudicativos, la Ley sobre Política Pública Ambiental dispone que se utilicen los procedimientos dispuestos en la L.P.A.U. para cuestionar el cumplimiento con la política ambiental por parte de la J.C.A. en consideraciones de documentos ambientales. Art. 19 de la Ley Núm. 416- *985 2004 (12 L.P.R.A. sec. 8002m); Sec. 4.1 de la L.P.A.U., 3 L.P.R.A. sec. 2171; Colony otros v. J.C.A., supra, págs. 447-449.

 Si se examina el historial legislativo de la L.P.A.U. (P. del S. 350, 1985-1988), se puede apreciar que diversas agencias expresaron en sus ponencias ante la Comisión de Gobierno del Senado que entendían que era innecesario que esta ley incluyera disposiciones sobre la revisión judicial, porque ya los tribunales se encar-garían de ese proceso según las normas que utilizaban para los demás casos. Sin embargo, estas disposiciones del proyecto de ley se mantuvieron, lo que tiende a indicar que la Legislatura quiso que las revisiones judiciales de decisiones adminis-trativas se trataran de forma diferente, según los principios de flexibilidad de la L.P.A.U.

 Véase W. Vázquez Irizarry, Derecho Administrativo, 80 (Núm. 3) Rev. Jur. U.P.R. 637, 652 (2011). Según el profesor Vázquez Irizarry, la consecuencia de la especificidad extrema de los efectos adversos de la acción administrativa requerida en Fund. Surfrider y otros v. A.R.Pe., supra, para que se reconozca legitimación en revisión judicial es que, ante la agencia, el ciudadano tendrá que afirmar, posible-mente de modo especulativo, la forma como un resultado eventual le afectará adver-samente para que conste en el expediente administrativo, que es lo único que ten-drán en sus manos los tribunales apelativos al revisar. Por consiguiente, la norma dispuesta, en vez de asegurar que los tribunales atiendan solamente revisiones en las que los peticionarios están sufriendo o sufrirán daños concretos, logra lo contra-rio, pues obliga a suponer desde el inicio cuáles serían todos los efectos específicos de un acto que está aún en desarrollo como única opción para que el caso no muera en los tribunales.

 j3j acceso a ja justicia es un pilar de la política que guía la Rama Judicial. Exposición de Motivos de la Ley de la Judicatura del Estado Libre Asociado de Puerto Rico, Ley Núm. 201-2003; Rama Judicial de Puerto Rico, “Imperativo Estra-tégico III: Acceso a la justicia para todos y todas”, Plan Estratégico de la Rama Judicial de Puerto Rico 2012-2015, págs. 33-34.

 «jj¡j acceso a la justicia como derecho”, en H. Birgin y B. Kohen, Acceso a la justicia como garantía de igualdad. Instituciones, actores y experiencia comparadas, Buenos Aires, Ed. Biblos, 2006, págs. 16-17.

 E. Rivera Ramos, “Las múltiples caras del acceso a la justicia”, en Primer Congreso Acceso a la Justicia — XXII Conferencia Judicial, San Juan, Pubs. Puerto-rriqueñas, 2005, pág. 8.

 íd., pág. 14.

 Comisión Interamericana de Derechos Humanos, El acceso a la justicia como garantía de los derechos económicos, sociales y culturales, Washington D.C., Ed. OEA, 2007, pág. 45.

 Pierce, op. cit., pág. 1537. Véase, también, E. Fontánez Torres, El derecho a participar: normas, estudio de caso y notas para una concreción, 68 (Núm. 4) Rev. C. Abo. P.R. 631, 637-638 (2007).

 inciUS0; en ei trámite de este caso ante el Tribunal Supremo, una mayoría de sus miembros se ha amparado en reglas procesales no jurisdiccionales para de-clarar “sin lugar” las solicitudes de prórroga y de permiso para contestar los alegatos de la parte contraria presentadas por el grupo de vecinos. Resolución del Tribunal y Voto particular disidente de la Juez Rodríguez Rodríguez en Lozada Sánchez et al. v. J.C.A. I, 183 D.P.R. 356 (2011).

 Opinión mayoritaria, pág. 904.

 R-10-30-1 de la J.C.A., pág. 3; Apéndice del certiorari CC-2011-722, pág. 15.

 R-10-45-1 de la J.C.A., págs. 3 y 7; Apéndice del certiorari CC-2011-718, págs. 122c 2 y 122c 6; Apéndice del certiorari CC-2011-722, págs. 35 y 39.

 Véase Fund. Arqueológica v. Depto. de la Vivienda, 109 D.P.R. 387, 391 (1980).

 Fund. Surfrider y otros v. A.R.Pe., supra, pág. 612, opinión disidente de la Jueza Fiol Matta.

 Opinión mayoritaria, págs. 924-925.

 gi concepto “activismo judicial” es un epíteto vacío, porque se utiliza de-pendiendo del resultado del caso, que es la falla que el mismo concepto pretende identificar. K. Roosevelt, The Myth of Judicial Activism: Making Sense of Supreme Court Decisions, New Haven, Yale University Press, 2006, págs. 37-44. Véase H.J. Spaeth y S.H. Teger, “Activism and Restraint: A Cloak for the Justices’ Policy References”, en S.C. Halpern y Charles M. Lamb, Supreme Court Activism and Restraint, Massachusetts, Lexington Books, 1982, págs. 277-301. Asimismo, no cabe hablar de una única decisión imparcial, pues distintas posturas sobre un mismo asunto pueden argumentarse con fundamentos razonables y no parcializados. A. Sen, The Idea of Justice, Cambridge, Harvard University Press, 2009, págs. 194-207.

 ¡<;j constitucionalista estadounidense Laurence Tribe llama a ser cautelosos con las decisiones que encuentran respuestas simples a problemas complejos, porque pasan desapercibidas a pesar de que tienen un gran impacto en las vidas de los ciudadanos. L.H. Tribe, God Save This Honorable Court: How the Choice of Supreme Court Justices Shapes Our History, New York, Ed. Random House, 1985, pág. 49.

 yéase J.O. Freedman, Crisis and Legitimacy: The Administrative Process and the American Government, Cambridge, Cambridge University Press, 1978.

 “When people feel they can’t count on the law to do what it is supposed to do, they begin to disregard it. ... It is because most reasonable people want to live in a society of reasonable laws —enforced in a reasonable and even-handed manner— that the justice system has the authority to be effective at all.” American Bar Association, “...And Justice for All”: Ensuring Public Trust and Confidence in the Justice System, Standing Committee on Judicial Independence, 2001, pág. 7.

 Fund. Surfrider y otros v. A.R.Pe., supra, pág. 611, opinión disidente de la Jueza Fiol Matta.